In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2991

United States of America,

Plaintiff-Appellee,

v.

Lawrence Brown III,

Defendant-Appellant.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-CR-17--Barbara B. Crabb, Judge.


Argued September 15, 2000--Decided November
14, 2000




   Before Flaum, Chief Judge, and Kanne and
Williams, Circuit Judges.

   Flaum, Chief Judge.  Lawrence Brown III
was convicted, following his guilty plea,
of possession of two sawed-off shotguns
and a destructive device. Brown now
appeals his conviction, arguing that the
district court erred in denying his
motion to suppress evidence gathered as a
result of a protective pat-down search.
For the reasons stated herein, we affirm.

Background
   December 27, 1998 turned out to be a
difficult day for Brown. His encounter
with Edgerton police officer Chris
Chilson evolved from a series of
incidents that occurred during the
afternoon and early evening of that day.
At approximately 4:15 p.m., Chilson
received a dispatch order to investigate
a citizen's complaint of intoxicated
driving. He was told that the incident
involved a red and black Chevy Blazer
with the Wisconsin license plate number
CEZ-802. Before arriving at the
complainant's home, Chilson ran the plate
number and learned that the vehicle was
registered to Larry and Vicky Brown of

Edgerton, Wisconsin. Chilson was familiar with Brown from an earlier contact and knew that he was a light-skinned African American male in his early 40's. Previously, Chilson had seen Brown "face-to-face" at Edgerton High School when Chilson, acting in a backup capacity, had run Brown's record for warrants.

Chilson talked to the complainant and ascertained that the red and black Chevy Blazer had just left her area. Initially she had approached the driver because he was honking his horn. The driver, who claimed to be in the wrong place, refused to tell her his name. When she asked the driver to leave her premises, he called her a bitch and proceeded to drive into the back of her Blazer, damaging it. After this exchange took place, the driver then drove toward the end of a cul de sac. He proceeded to turn around in a driveway that had a chain in front of it in order to prevent people from using it in this very manner. In the process of doing so, the driver drove over the chain and post, breaking both, and then drove away with the chain and post attached to the front of his Blazer, while he "flipped [the complainant] the bird." While being interviewed, the complainant described the driver as being a white male in his late 30's to early 40's with dark hair and a mustache. This description, according to Chilson, seemed to match that of Brown. The complainant felt that the driver was probably intoxicated based upon the manner of his speech, his inappropriate language, and his driving. Another individual also witnessed these events and provided Chilson with a similar report.

While on duty later that evening Chilson received another dispatch message telling him that a Chevy Blazer with the license plate number CEZ-802 (Brown's Blazer license plate number) had left a McDonald's just outside the Edgerton city limits and that the driver seemed to be drunk. Chilson drove to the part of Edgerton nearest to the McDonald's, hoping to come across the allegedly intoxicated driver, whom he presumed to be Brown. State Trooper Kronau advised Chilson that the Blazer was approaching the city limits of Edgerton. Chilson discovered the Blazer parked on Wileman Drive, with its headlights on, and the engine running. Although parking on

Wileman Drive is not illegal, it is not a residential street, and so Chilson thought this was an unusual place to stop. While driving toward the Blazer, Chilson noticed that a chain was hanging from the Blazer's front bumper. He turned on his red and blue lights to commence a stop and parked behind the Blazer. Thereafter, Rock County Deputy Davies arrived and stood to the rear of Brown's window while Chilson approached the driver's window. Chilson recognized the defendant as Brown and saw that he was eating a sandwich and drinking from a McDonald's cup. Chilson did not smell any odor of intoxicants nor did he observe any empty containers that might have held alcohol. What he did notice was that Brown's eyes were moving slowly and deliberately and that his speech was slurred. Brown was also wearing a jacket.

Chilson told Brown that his vehicle was suspected of being involved in two hit-and-run accidents and that several people had described a person matching his appearance who was driving intoxicated. Chilson then asked Brown to step out of the car because he desired to conduct field sobriety tests. Brown complied and Chilson directed him to place his hands on the truck while he proceeded to conduct a pat-down search. While the pat-down was occurring, State Trooper Kronau arrived on the scene and stood on Chilson's left while Deputy Davies stood to Chilson's right. During the pat-down, Chilson felt hard objects under Brown's arms and discovered a loaded .45 handgun. At this point, the officers handcuffed Brown behind his back. While continuing to pat down Brown, Chilson found a loaded Taurus .454 revolver in his waistband and discovered that Brown was wearing a bullet proof vest. The officers then arrested Brown for weapons violations and searched his trunk and found additional weapons and other suspected contraband. The Bureau of Alcohol, Tobacco, and Firearms later became involved and obtained a search warrant for Brown's house. This search resulted in the recovery of contraband and additional federal charges against Brown.

The district court denied Brown's motion to suppress the evidence that was obtained as a result of the protective pat-down and all the subsequent evidence

arising out of this incident. The district court concluded that the frisk of Brown was appropriate: A reasonable officer in the situation of Chilson would have ensured that Brown was not armed. Brown's behavior earlier in the day as well as the circumstances at the time that he was stopped on Wileman Drive created a situation where a police officer would have found it necessary to conduct a protective pat-down search. The district court did not affirm, however, the magistrate judge's conclusion that the search was justified as a search incident to arrest. Brown pleaded guilty to Count 3 of the indictment (possessing two sawed-off shotguns and a destructive device), but the plea was conditional, so Brown reserved his right to appeal the district court's adverse determination on his motion to suppress. This appealthereafter followed.

Discussion

In reviewing the district court's decision on a motion to suppress, we review questions of law de novo and questions of fact for clear error. United States v. Williams, 209 F.3d 940, 942 (7th Cir. 2000); United States v. Faison, 195 F.3d 890, 893 (7th Cir. 1999). Therefore, "we review de novo the ultimate conclusion that the police did not have reasonable suspicion to stop or search the individual, but we review all findings of historical fact and credibility determinations deferentially, under the clear error standard." United States v. Johnson, 170 F.3d 708, 712-13 (7th Cir. 1999). In this case, the defendant is not challenging the district court's factual findings. He is questioning the district court's conclusion that the protective pat-down search was proper based upon reasonable suspicion under the Fourth Amendment and accordingly we review the district court's finding de novo. See Ornelas v. United States, 517 U.S. 690, 699 (1996) ("[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal.").

When an individual is stopped by a police officer, this incident can potentially involve two stages: (1) the actual stop itself; and (2) a protective pat-down search. The initial detention of an individual is justified if the police

officer is stopping and briefly detaining "a person for investigative purposes, so long as the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" Johnson, 170 F.3d at 713 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). Brown does not contend that Chilson lacked the authority to stop and detain him for investigative reasons. The protective pat-down, which occurred during the second part of the investigatory stop, is what Brown argues was unwarranted. When conducting a protective pat-down during a Terry stop, "the officer must be able to point to specific and articulable facts that the individual is armed and presents a risk of harm to the officer or to others." Id. at 713.

The district court stated that it was incumbent upon "the government to show that Chilson had a reasonable suspicion that defendant might be armed and dangerous." In deciding whether Brown was dangerous or not, the district court concluded that "[t]he inquiry is objective: would a reasonably prudent person believe in the circumstances that the individual he is dealing with is armed and dangerous?" The events leading up to the protective pat-down of Brown revealed his "potential dangerousness." Chilson had "reliable reports" that Brown appeared drunk at approximately 4:00 p.m. and 8:00 p.m. Furthermore, reports relayed that Brown had used his "sport utility vehicle as a battering ram" and that he was not "particularly cooperative" when approached by Chilson. According to the district court, the "[d]efendant could be characterized as a belligerent drunk, that is, one who is a potential danger even if unarmed." Nonetheless, the district court acknowledged that it was a "close question" as to whether a reasonable police officer would have believed Brown might be armed and that it was necessary to conduct a protective pat-down. What made the protective pat-down a "close question" was the lack of specific facts indicating that Brown possessed a weapon. Chilson had no report that Brown was carrying a weapon nor did he see anything in Brown's Blazer suggesting that he was armed. Nonetheless, the district court judge concluded that a reasonable police officer would have conducted a pat-down

of Brown based on: (1) his "very strange behavior during that day;" (2) the fact that Brown was wearing a jacket that could have been concealing a weapon; (3) the fact that Brown was eating in a dark and unpopulated area; and (4) the reality that Brown was going to be outside his vehicle for the sobriety tests and not in physical custody. All of these factors combined made it prudent, in the judgment of the district court, for Chilson to ensure Brown was unarmed.

Brown argues that the district court erred in its conclusion because: (1) Chilson subjectively did not fear that Brown was armed; and (2) the objective facts do not suggest that Chilson was warranted in conducting a protective-pat-down. Brown contends that the test as to whether a police officer has properly conducted a protective pat-down is not strictly objective, but rather the test has a subjective component as well. Chilson did say that he frisked Brown for his own safety and for the safety of others. However, Chilson also admitted that he usually frisked people when he suspected them of drunk driving. Brown argues that this shows Chilson's practice of frisking drunk drivers is routine and is not based on any particularized facts.

Alternatively, Brown contends it would have been unreasonable for a police officer to believe that he was armed and dangerous considering the circumstances. Brown argues that he was legally parked along a non-residential roadside. At the time, he contends that he was eating something and drinking from a McDonald's cup. During the two minute conversation with Chilson, Brown talked slowly and in a slurred tone. Although initially sarcastic and hesitant, Brown then fully cooperated with Chilson. All the alleged prior events at the time of the pat-down, according to Brown, were not yet confirmed. Brown also argues that his car was illuminated by the headlights of the two marked police cars and neither officer drew his gun before the pat-down. When Chilson approached Brown, Brown did not smell of alcohol, Chilson did not see any weapons, nor did Brown appear to have weapons in his truck. Brown asserts that he was not physically assaultive toward anyone that day, and after initially being sarcastic, he cooperated with Chilson. All of these facts taken

together, according to Brown, indicate that a reasonable police officer would not have perceived him as armed or dangerous.

   Factual circumstances can be painted in various lights, as seen by the differing versions presented by the district court and Brown regarding the events that occurred on December 27, 1998. Brown's account of the events that day portrays his situation in a sympathetic light, although his rendition on closer inspection raises some suspicions. That fateful day, among other incidents, Brown had run into the complainant's car and drove over a chain and post fence. Brown perceives the consequences of the day's incidents as unlucky and unjustified. These very events though were not viewed by others as mere disturbances. The complainant was concerned about Brown's behavior enough to notify the police and provide them with his license plate number. Whether Brown's behavior rises to the level of being a danger to the police and others is at the heart of the issue in this case. We therefore have to try to envision the position of Chilson on the night in question.

   We should try to step back and observe what an outsider would think of the day's events. In Terry itself the court said that a police officer "need not be absolutely certain that the individual is armed" because "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. 1, 27 (1968). With this perspective in mind, we can begin to look at how oneparticular day in Brown's life led to his current situation. One must remember that Brown had not started his day on a positive note; he had run into the complainant's car and run over a chain and post fence. Brown heightened the level of concern regarding his actions by showing indications that he was drunk and belligerent. This type of behavior would make a reasonable police officer question Brown's state of mind.

   Brown continued to act in an unusual manner. After Chilson had already heard from the complainant and another witness about the events earlier in the day, he received a dispatch around 8:20 p.m. that

a driver, who appeared drunk, had just left from McDonald's in a Blazer andChilson presumed that this was Brown. Upon arriving at the scene, Chilson saw a chain hanging from the front bumper of the Blazer--a remnant from Brown's earlier escapade. At this point Chilson identified himself and told Brown why he was there, to which Brown responded by asking whether it was illegal to park and eat where he was located. This remark led Chilson to categorize Brown as a "maybe" person. A "yes" person is someone Chilson believes will cooperate and a "no" person is an individual that he believes will not cooperate. Brown even said that "[b]ased on his attitude, [he] felt there was a risk of him possibly leaving or fleeing or fighting." One must remember that Chilson had knowledge of Brown's earlier behavior in the day and had no reason to trust that Brown would cooperate. Chilson even said that he conducted the pat-down search for his "safety and the safety of everyone on the scene." If one were observing the interaction between Brown and Chilson that evening, it would be apparent that Brown was not the most cooperative individual. Furthermore, Brown was parked in a less than populated area with inadequate lighting and there were reports that he was drunk.

What perhaps makes this case somewhat unusual is that Chilson was very candid. Chilson admitted that he "usually" conducts a protective pat-down during sobriety tests. Had Chilson only said that he labeled Brown as a "maybe" person and that he felt Brown was a danger to himself and others, then it would have been difficult for Brown to question Chilson's subjective state of mind. However, to take this one admission by Chilson and extrapolate that he improperly frisked Brown without any individualized suspicion that he presented a danger to himself and others appears unfair in the context of this case.

Chilson should not be penalized because he did not provide a very sensationalized version of the facts in order to shore up his justification for the protective pat-down. His honest responses should be commended. He merely characterized Brown as a "maybe" person, mentioned that he was a possible danger, and that he

usually pats down people during sobriety tests. He did not expound upon the fear that he felt when approaching Brown in his car or describe Brown's behavior in such a manner as to preclude anyone from questioning his rationale for conducting the protective pat-down search. A police officer conducting a stop is not required to "precisely and individually articulate the facts that added up to suspicion in his mind." United States v. McKie, 951 F.2d 399, 402 (D.C. Cir. 1991) (per curiam). Perhaps Chilson is not the type of officer who can articulate readily his sense of fear or perhaps his own particular disposition makes him less forthcoming about these potentially dangerous situations.

If we were to parse every reason as to why Chilson decided to conduct a protective pat-down search of Brown, we would inevitably find inconsistencies and a scenario riddled with competing justifications. This still would not negate the reality that Brown was acting erratically and somewhat aggressively throughout the late afternoon to early evening period and therefore posed some concern. It is important to remember that "we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." Id. at 402.

To judge Chilson's behavior solely upon his subjective and very personal reaction to the Brown situation would lead to "judicial micromanagement, oversight, and second-guessing of officers' behavior to far-reaching dimensions, quite beyond that required to ensure compliance with the law (and into the very danger-laden areas where officers must confront the most delicate and dangerous decisions)." United States v. Bonner, 874 F.2d 822, 829 (D.C. Cir. 1989). Chilson did not conduct a pat-down of Brown based upon some sort of "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27. Brown provided Chilson with adequate provocation to be concerned about his own safety and the safety of others, considering his behavior earlier in the day and his initial reaction to Chilson as well as

his slow eye movement and deliberate and slurred speech. Taken as a whole, Brown had acted erratically throughout the day, and a reasonable police officer would have wondered whether Brown posed a threat to himself or herself or others. However, notwithstanding our decision that the officer's conduct was reasonable in this case, considering the stated practice of Chilson, one should not read into the opinion any implicit approval of the frisking of drivers during routine traffic stops for drunk driving.

Conclusion

Brown's behavior on December 27, 1998 would have caused a reasonable individual to pause and wonder about his or her safety, thereby warranting a protective pat-down search. Chilson acted as a prudent person in the situation and therefore we Affirm the district court's decision.