In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-2372

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

DARION FORD,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 02 CR 13—**Rudy Lozano**, *Judge.*

ARGUED JANUARY 9, 2003—DECIDED JUNE 26, 2003

Before RIPPLE, ROVNER and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Darion Ford activated a metal detector at the entrance of a roller skating rink. An off-duty police officer, acting as a security guard at the rink, frisked him and discovered a drug scale, crack cocaine, and approximately $1,500 in cash. Mr. Ford subsequently was charged with violating 21 U.S.C. § 841(a)(1) by knowingly possessing with the intent to distribute a controlled substance. The district court granted Mr. Ford's motion to suppress the evidence that had been found on his person. The Government appeals that decision. For the reasons set forth in this opinion, given the record and the pro-

cedural posture of this case, we must affirm the decision
of the district court.

## A.

The Roller Dome, a roller skating rink in Hammond,
Indiana, employs two off-duty uniformed police officers
on Saturday nights as security guards. Officer Thomas
began his shift at 10:30 p.m., immediately after the end of
his police patrol shift. While working at the Roller Dome,
he remained dressed in his full uniform and was wearing
his service revolver. His patrol car was parked outside
the Roller Dome; his canine partner remained inside his
vehicle.

Prior to beginning his shift at the Roller Dome, Officer
Thomas saw Mr. Ford in the parking lot of the establish-
ment. Mr. Ford had parked in a parking space designated
for handicap persons. Officer Thomas advised Mr. Ford
of the designation, and Mr. Ford moved his car to an-
other space without incident.

There is a foyer immediately inside the Roller Dome.
The ticket window is located there. Signs advise patrons
that items such as alcohol and weapons are prohibited.
Beyond the ticket window is the entrance to the facility's
skating rink. Above this doorway is a sign that reads: "You
are important to us and we are doing even more to pro-
tect you." Hr'g Tr. 04/12/02 at 15. A metal detector is
located beyond this interior doorway. The "doing even
more to protect you" sign was put up after the metal
detector was installed. The owner of the Roller Dome
testified that the reason she installed the metal detector
was for the safety of her clientele, most of whom are
children and teenagers. The rink is in a high crime area;
gang members have been known to patronize the rink,

and screwdrivers and knives have been found by the owner near the Roller Dome's dumpster.

There is no place near the metal detector for patrons to empty their pockets of benign metal objects. Nor are patrons asked to remove or identify any metal items before they walk through the metal detector. Officer Thomas testified that, pursuant to Roller Dome policy, he performs a pat-down search on every male patron who activates the metal detector. Officer Thomas further testified that the detector was activated frequently. Items such as pens, watches and buckles would cause the alarm to sound. *See id.* at 47.

Mr. Ford went through the metal detector and activated the alarm. Officer Thomas, who was at his post near the detector, said "step forward." *Id.* at 31. Mr. Ford appeared nervous, looked around, reached for his breast pocket, and started to back away—but said nothing. Officer Thomas pulled Mr. Ford's hands up and performed a pat-down search. Officer Thomas felt a hard, heavy, metal object in Mr. Ford's breast pocket. He looked inside Mr. Ford's pocket and saw a scale and residue of what he believed to be crack cocaine. Officer Thomas asked Mr. Ford to step outside.

Once outside, Mr. Ford pushed Officer Thomas and tried to run, but Officer Thomas quickly apprehended him, conducted him to his patrol car and threatened to release his canine partner unless Mr. Ford stopped resisting. Officer Thomas then performed another pat-down in which he discovered crack cocaine and approximately $1,500 on Mr. Ford's person.

Officer Thomas testified, and the district court found his testimony credible. He said that searches of Roller Dome patrons had produced weapons such as Chinese

stars, knives and homemade knives. He had never found any firearms. Officer Thomas further stated that Roller Dome patrons have walked into the facility but exited prior to passing through the detector. He does not search such people. He also testified that people have walked through the metal detector, turned around and walked out, and that he does not follow such people out of the building and search them. He testified that, if Mr. Ford had turned around and walked out of the Roller Dome after activating the metal detector, Officer Thomas would not have searched Mr. Ford. Notably, neither Officer Thomas nor any signs at the Roller Dome informed Mr. Ford that he could refuse to be searched and just exit the Roller Dome.

Mr. Ford was charged with knowingly possessing with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). Mr. Ford moved to have the scale, crack cocaine and cash suppressed on the ground that it was discovered through an unlawful search. He contended that both the search by the metal detector and the subsequent pat-down were unreasonable searches.

The district court held that the metal detector search implicated the Fourth Amendment because of Officer Thomas' involvement with the search, but that the Roller Dome's practice of employing a metal detector to search patrons was reasonable. Nevertheless, the district court held that the pat-down was an unreasonable search. The Government argued that the pat-down was reasonable because Mr. Ford appeared nervous, looked around, stepped backward and reached for his pocket after he activated the metal detector. The Government additionally relied on the facts that the rink is in a high crime area, it was 10:30 p.m., numerous children were present and Mr. Ford had parked in a handicap parking space. The district court stated,

It would be disingenuous to justify the pat-down performed on Defendant based on the above factors given Officer Thomas never testified that the high crime area, time of day, or parking event factored into his decision to search and based on the fact that the decision to search Defendant, as indicated by Officer Thomas saying, "step forward," was made prior to Defendant reaching for his pocket. Also, as noted previously, Officer Thomas testified he initially decided to search Defendant because of Roller Dome policy. Therefore, the Government may only rely upon the activation of the metal detector to justify the pat-down.

R.32 at 20-21 (internal citations omitted).

The court then concluded that activation of the detector alone was not sufficient to give rise to reasonable suspicion and was distinguishable from other metal detector activation cases because Mr. Ford was not asked if he was carrying any metal or to otherwise explain, nor was he asked to remove metal items from his pocket.

Finally, the court found that Mr. Ford did not consent to the pat-down search, noting that he stepped away from Officer Thomas. The district court therefore granted Mr. Ford's motion to suppress.

## B.

We begin our analysis of this matter by addressing several threshold, but important issues.

First, we note that the standard of review for the situation before us is well-established:

In reviewing the district court's decision on a motion to suppress, we review questions of law *de novo* and questions of fact for clear error. Therefore, we

> review *de novo* the ultimate conclusion that the
> police did not have reasonable suspicion to stop or
> search the individual, but we review all findings of
> historical fact . . . under the clear error standard.

*United States v. Brown*, 232 F.3d 589, 591-92 (7th Cir. 2000)
(internal quotation marks and citations omitted). The par-
ties expressly state that they do not dispute the district
court's findings of facts, *see* Br. of Appellant at 7; Br. of
Appellee at 4, thus our review of the question presented
is de novo.

Before proceeding further, we also must note—indeed,
we stress—the unusual posture in which this case comes
to us for decision. The Government, in its brief and ex-
pressly at oral argument, stated that it had chosen not
to argue either that Officer Thomas was not a state actor
or that Mr. Ford had consented to the pat-down search
by proceeding through the metal detector. Because both
of these arguments have been waived expressly, the issues
of state action and consent to the pat-down search are
not before us. Consequently, the only issue before us is
whether Officer Thomas had a reasonable suspicion to
undertake a protective pat-down for weapons because
of Mr. Ford's activation of the metal detector, his other
activity prior to the search, and the surrounding circum-
stances such as the late hour, the high crime area and
Mr. Ford's initial parking in a handicap space.

## C.

The principles that govern the factual situation before
us are well-settled. "An officer may conduct a protective
pat-down for weapons if a reasonably prudent man in
the circumstances would be warranted in the belief that
his safety or that of others was in danger." *United States*

*v. Holifield*, 956 F.2d 665, 667 (7th Cir. 1992) (internal quotation marks and citations omitted). That is, "[a] protective pat-down search . . . is appropriate only if the agents have at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the agents or others (unless, of course, the subject consents to the search)." *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001). This analysis is objective: "It is important to remember that *we are not limited* to what the stopping officer says or *to evidence of his subjective rationale*; rather, we look to the record as a whole to determine what facts were known to the officer and then consider *whether a reasonable officer in those circumstances* would have been suspicious." *Brown*, 232 F.3d at 594 (internal quotation marks and citations omitted; emphasis added). Moreover, we look at "the totality of circumstances known to the officer[]." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (internal quotation marks and citations omitted). Given the objective nature of this standard, the district court erred to the extent that it failed to consider the totality of the circumstances and to the extent that it relied upon the subjective intent of Officer Thomas. Nevertheless, as we shall explain in more detail in the following paragraphs, given the narrow ground on which the Government attempts to sustain the search, we must conclude that the district court reached the correct result when it held that the pat-down was unreasonable.

Our first task is to ascertain the point at which Fourth Amendment concerns became implicated. We have explained:

> [T]he Supreme Court applied a two-part test to decide whether a person had been seized such that Fourth Amendment protections are triggered (whether that seizure be an arrest, a *Terry* stop, or otherwise): first,

determine whether any physical force simultaneously accompanied the officer's show of authority, and second, determine whether the defendant failed to comply with that show of authority. If no physical force accompanied the show of authority and a person chose to ignore or reject that show of authority, the defendant is not seized until the officer applied physical force and the person submitted to the officer's show of authority. . . .

. . . [U]nder this test, a fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority.

*United States v. $32,400.00, in United States Currency*, 82 F.3d 135, 138-39 (7th Cir. 1996) (internal quotation marks and citations omitted).

Under the approach that we have outlined, we believe that Mr. Ford was seized when Officer Thomas pulled up his arms and began to pat him down. Had Mr. Ford stepped forward, as asked, his submission to the officer's show of authority would have triggered the protections of the Fourth Amendment. However, according to the record, when the officer said, "step forward," Mr. Ford stepped back, which does not constitute submission to the asserted authority. Therefore, the *Terry* stop began when Officer Thomas pulled up Mr. Ford's arms and performed the pat-down.

Having determined the point at which Fourth Amendment concerns control, we must now evaluate, under an objective standard, the totality of the circumstances known to Officer Thomas at that time and determine if "a reasonable officer in those circumstances would have been suspicious." *Brown*, 232 F.3d at 594 (internal quota-

tion marks and citations omitted). Consequently, in determining whether the pat-down was reasonable, we must evaluate all of the circumstances prior to Officer Thomas pulling up Mr. Ford's arms.

We look first at what the record tells us about Mr. Ford's appearance at that moment. As we have just noted, he stepped backward, not forward, he exhibited a nervous appearance, and reached at his breast pocket.[1]

The circumstances surrounding the encounter are also relevant to our inquiry. At this particular metal detector checkpoint, and unlike most such checkpoints, the patrons were not asked to remove benign metal objects. Indeed, the record affirmatively shows that the patrons were not provided with a place to remove any benign metal objects, such as keys, change, or a watch, from their pockets or persons. Under these circumstances, Mr. Ford's activation of the metal detector and subsequent reaching at his pocket was insufficient to create a reasonable suspicion that would justify a protective pat-down. Almost anyone who passes through a metal detector and activates it is alarmed and reaches for those areas of clothing that might have triggered the alarm.[2] Such actions do not give rise to reasonable suspicion to perform a pat-

---

[1] As testified to by Officer Thomas, after Mr. Ford activated the metal detector and was asked to step forward, "[h]e immediately started looking around and looking real nervous. He took his hand and actually went for his pocket." Hr'g Tr. 04/12/02 at 31.

[2] Again, we *emphasize* that the Government has waived expressly the argument that Mr. Ford's passage through the metal detector manned by a uniformed officer constituted consent to the pat-down search. It also has waived the argument that the police officer was a private actor.

down, which requires that "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Holifield*, 956 F.2d at 667 (internal quotation marks and citations omitted). Other factors such as the late hour and high crime area hardly improve the Government's case. The fact remains that *anyone* with a pen, a watch, a bet buckle or other such benign metal object would have triggered the alarm.

We note that our decision today is compatible with the approaches of other courts that have had to rule on the reasonableness of searches involving the activation of metal detectors. Notably, in those cases, a determination of reasonable suspicion was not premised merely on the circumstances here. Rather, the person, having initially activated the detector, was asked to remove metal from his pocket, to go through the detector a second time, or to take some other measure to improve the accuracy of the test. *See United States v. Epperson*, 454 F.2d 769, 770, 772 (4th Cir. 1972) (upholding frisk where person activated metal detector, was subsequently asked to remove metal objects from clothing or person and pass through a second time, and then activated detector a second time before officer frisked his jacket); *McMorris v. Alioto*, 567 F.2d 897, 901 n.3 (9th Cir. 1978) (upholding courthouse search procedures directing that if person activated detector, he subsequently would be asked to remove any metal from his person and pass through a second time, if activated on second pass, the person was only admitted to courthouse if he expressly consented to a pat-down); *United States v. Dalpiaz*, 494 F.2d 374, 375 (6th Cir. 1974) (upholding search where defendant had activated metal detector three times and was asked each time to remove all metal objects from his pockets).

Because, on this record, the pat-down was unreasonable, we must affirm the judgment of the district court.[3]

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[3] We need not address Mr. Ford's argument that the metal detector search itself was unreasonable.