In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2152

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BERTON MAYS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cr-00230-JMS-TAB-1 — **Jane E. Magnus-Stinson**, *Judge.*

ARGUED JANUARY 14, 2016 — DECIDED APRIL 11, 2016

Before FLAUM and RIPPLE, *Circuit Judges*, and PETERSON, *District Judge.*[*]

RIPPLE, *Circuit Judge*. Berton Mays left the scene of a fight and was followed by an investigating officer who wanted to

[*] The Honorable James D. Peterson of the United States District Court for the Western District of Wisconsin, sitting by designation.

interview him about the altercation. Mr. Mays repeatedly declined to stop and talk to the officer, expressing his declination in colorful and abusive language. After observing Mr. Mays's demeanor and suspecting that he might be armed, the officer told him to stop and touched his shoulder in order to keep a distance between the two. Mr. Mays's manner of turning made the officer concerned for his safety, and he employed his already drawn Taser. A semi-automatic firearm fell to the ground.

Mr. Mays ultimately was prosecuted in federal court for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). He pleaded guilty to the offense, but reserved the right to appeal the district court's denial of his motion to suppress the firearm, which he contended was the product of an illegal seizure. He also reserved the right to appeal the district court's denial of his motion to suppress a statement he had made to federal agents while he was in pretrial confinement. Mr. Mays now appeals, raising these preserved challenges.

We affirm the judgment of the district court. As the district court determined, the officer's stop was supported by reasonable suspicion as required by the Fourth Amendment. With respect to the statement, there was no independent violation of Mr. Mays's Sixth Amendment right to counsel.

# I

## BACKGROUND

### A.

On August 8, 2013, Indianapolis Metropolitan Police Department Officer Matthew Coffing was on patrol in his police

car on the southeast side of Indianapolis.[1] His area of patrol was designated a "problem area or a hot spot" because of the high number of "dispatched runs [to the area] that may involve violent crimes, robberies, narcotic investigations."[2] At approximately 6:00 p.m., Officer Coffing observed a fight in progress involving three individuals: a female on the ground, a male on top of her, and a second male attempting to pull the first man off her. A fourth individual, Mr. Mays, was also present. At the time of Officer Coffing's approach, Mr. Mays, while present, did not appear to be an active participant in the fight. Officer Coffing requested backup and exited his car. As he approached the four individuals, Mr. Mays began to walk away. Officer Coffing asked Mr. Mays to stop, but he continued to walk. Officer Lepsky then arrived at the scene as backup; Officer Coffing described Mr. Mays to Officer Lepsky and asked him to make contact with Mr. Mays and to inquire about his involvement, if any, with the fight.

Officer Lepsky initially followed Mr. Mays in his marked police car, but soon parked, exited the car, and followed Mr. Mays on foot. As he drew near, Officer Lepsky asked Mr. Mays to stop and to identify himself, but Mr. Mays continued to walk at a quick pace and said over his shoulder, "F--k you. I don't have to stop. What the f--k do you want?"[3] Officer Lepsky continued to follow Mr. Mays, asking him several times to stop and to talk with him about the fight, but

---

[1] The facts we recite are taken from testimony given during the suppression hearing, credited by the district court, as well as the court's findings of fact in its order denying the motion to suppress.

[2] R.62 at 11.

[3] *Id.* at 15–16.

Mr. Mays refused to stop, responding again, "F--k you. You don't have any reason to stop me."[4]

As he got closer to Mr. Mays, Officer Lepsky, relying on his training, noticed that Mr. Mays's body language was "[v]ery tight, aggressive looking," and that his hands were in the pockets of his shorts.[5] Officer Lepsky again asked Mr. Mays to stop and to remove his hands from his pockets. Mr. Mays continued to walk away from the officer, removed *only* his left hand from his pocket, and again cursed, "[F]--k you."[6] Officer Lepsky observed that Mr. Mays continued to keep his right hand in his pocket and angled his body away from Officer Lepsky in a manner that the officer interpreted as an attempt to shield the right side of his body from view. To the officer, this demeanor suggested that Mr. Mays "may be concealing something, a possible weapon."[7] Officer Lepsky told Mr. Mays to remove his right hand from his pocket, and Mr. Mays again stated, "F--k you. I don't have to stop."[8]

Now within an arm's length of Mr. Mays, Officer Lepsky ordered Mr. Mays to stop. At this point, Mr. Mays stopped walking forward but "continued to move in a circular motion as his right side was going away from" the officer.[9] With his

---

[4] *Id.* at 17.

[5] *Id.* at 16.

[6] *Id.* at 18.

[7] *Id.* at 19.

[8] *Id.*

[9] *Id.* at 20.

right hand, Officer Lepsky reached down and readied his Taser. He then reached across his body and placed his left hand on Mr. Mays's right shoulder in order to prevent him from turning around and to keep distance between the two men. At the same time, Officer Lepsky again directed Mr. Mays to take his hand out of his right pocket. Mr. Mays, however, turned his right shoulder away from Officer Lepsky and said, "Get the f--k off me."[10] As Mr. Mays continued to turn his body around toward Officer Lepsky, and as Officer Lepsky stepped back to create distance, the officer observed a metallic object in Mr. Mays's right hand, which he recognized as a handgun. Officer Lepsky then utilized his Taser, striking Mr. Mays in the chest. He then stepped back and pulled out his service-issued firearm. The handgun observed in Mr. Mays's hand landed on the ground nearby and was recovered by officers.

**B.**

Mr. Mays was placed under arrest for resisting law enforcement and for possessing a firearm as a felon. He was read his *Miranda* rights and questioned about the gun and the fight, but he claimed to have no knowledge of either. On August 9, 2013, Mr. Mays was charged in state court with unlawful possession of a firearm by a serious felon and resisting law enforcement. Several days later, two federal agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives visited Mr. Mays in jail. He signed a waiver of his *Miranda* rights and made an inculpatory statement. On August 21, 2013,

---

[10] *Id.* at 23.

Mr. Mays was charged with possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). Later, a federal grand jury indicted him on that charge; the state court charges against him were dropped.

Mr. Mays filed a motion to suppress the evidence of the firearm recovered on the ground that it was the product of an illegal seizure. He also moved to suppress the inculpatory statement made to federal agents as fruit of the unconstitutional seizure or, alternatively, on the independent ground that it was made in violation of his Sixth Amendment right to counsel. The district court denied Mr. Mays's motion to suppress. The court explained that because "Mr. Mays never submitted to any show of authority," he was not seized for purposes of the Fourth Amendment until "Officer Lepsky used physical force to stop Mr. Mays from moving by placing his hand on Mr. Mays'[s] shoulder."[11] The court then concluded that "based on an objective analysis of the totality of the circumstances, at the time Officer Lepsky seized Mr. Mays, reasonable suspicion existed to conclude that Mr. Mays might have had a weapon and been about to use physical force against Officer Lepsky."[12] Because there was no Fourth Amendment violation, the court determined that the inculpatory statement could not be suppressed as the fruit of that seizure. The court also concluded that the Sixth Amendment was not violated because Mr. Mays knowingly and voluntarily had waived his right to counsel.

---

[11] R.61 at 9–10.

[12] *Id.* at 13.

Mr. Mays pleaded guilty to being a felon in possession under 18 U.S.C. § 922(g)(1) and was sentenced to ninety-six months' imprisonment to be followed by a two-year term of supervised release. Mr. Mays reserved the right to appeal the district court's denial of his suppression motion and, in due course, timely filed an appeal in this court.

# II

## DISCUSSION

We review the district court's denial of Mr. Mays's motion to suppress under a two-pronged standard of review; we review de novo the court's ultimate conclusion that Officer Lepsky had reasonable suspicion to stop Mr. Mays; we review the court's findings of historical fact under the clear error standard. *United States v. Griffin*, 652 F.3d 793, 797 (7th Cir. 2011); *United States v. Ford*, 333 F.3d 839, 843 (7th Cir. 2003).

### A.

The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. Const. amend. IV. The Supreme Court has made clear that an investigatory stop, which constitutes only a limited intrusion into an individual's privacy, is reasonable, and therefore permissible, "if the officer making the stop is 'able to point to specific and articulable facts' that give rise to a reasonable suspicion of criminal activity." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). "[R]easonable suspicion requires more than a hunch but less than probable

cause and considerably less than preponderance of the evidence." *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (internal quotation marks omitted). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). This assessment requires that the court engage in an objective analysis that is "based on common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

The Fourth Amendment only protects against unreasonable searches and seizures. Therefore, "[o]ur first task is to ascertain the point at which Fourth Amendment concerns became implicated." *Ford*, 333 F.3d at 844. A Fourth Amendment seizure is "not a continuous fact"; it is a single act that occurs at a discrete point in time. *California v. Hodari D.*, 499 U.S. 621, 625 (1991) (internal quotation marks omitted). A seizure may be effected in either of two ways: "through physical force…[or] through a show of authority and submission to the assertion of authority." *Griffin*, 652 F.3d at 798 (emphasis omitted) (internal quotation marks omitted). As we have explained:

> [T]he Supreme Court applie[s] a two-part test to decide whether a person had been seized such that Fourth Amendment protections are triggered (whether that seizure be an arrest, a *Terry* stop, or otherwise): first, determine whether any physical force simultaneously accompanied

the officer's show of authority, and second, determine whether the defendant failed to comply with that show of authority. If no physical force accompanied the show of authority and a person chose to ignore or reject that show of authority, the defendant is not seized until the officer applied physical force and the person submitted to the officer's show of authority.…

…[U]nder this test, a fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority.

*United States v. $32,400.00, in U.S. Currency*, 82 F.3d 135, 138–39 (7th Cir. 1996) (footnote omitted) (internal quotation marks omitted).

The parties agree that, during the early stages of the encounter, Mr. Mays did not submit to Officer Lepsky's repeated requests that he speak with him. Their disagreement centers on the proper characterization of the final seconds of the officer's interaction with Mr. Mays. The Government contends, and the district court agreed, that the seizure occurred when Officer Lepsky placed his hand on Mr. Mays's shoulder as he began to turn. Mr. Mays asserts that, when he ceased to walk forward, he was submitting to Officer Lepsky's authority and that, consequently, any Fourth Amendment assessment must be made at that precise moment. Mr. Mays argues that the district court's conclusion to the contrary is unsupported, given the variations in Officer Lepsky's sworn accounts as to whether the officer ever physically touched

Mr. Mays. In neither his initial incident report[13] nor his taped statement made in connection with the state charges[14] did Officer Lepsky mention any touching. However, the officer later swore in a supplemental affidavit that he placed his left hand on Mr. Mays's right shoulder immediately prior to Mr. Mays turning around.[15] Finally, Officer Lepsky's testimony at the suppression hearing, which included a physical reenactment of the encounter, was that Mr. Mays stopped and began to turn in a circular motion, which prompted Officer Lepsky to place his left hand on Mr. Mays's right shoulder to maintain distance. The district court credited Officer Lepsky's hearing testimony, a factual determination that Mr. Mays contends was clearly erroneous.

We generally defer to the district court's credibility determinations at suppression hearings "because we recognize that, unlike our review of transcripts, the district court had the opportunity to listen to testimony and observe the demeanor of witnesses." *United States v. Garrett*, 757 F.3d 560, 568 (7th Cir. 2014) (internal quotation marks omitted). We will therefore only reverse if we are "left with the definite and firm conviction that a mistake has been made," such as when "a district court credited exceedingly improbable testimony." *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (internal quotation marks omitted); *see also United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) (holding that "determinations of witness credibility can virtually never be clear error" (internal

---

[13] R.40-1 at 1.

[14] R.50-1 at 4.

[15] R.48-1 at 3.

quotation marks omitted)). With this deference in mind, we cannot say that Officer Lepsky's hearing testimony was so improbable that the district court clearly erred in crediting it.

At the suppression hearing, Mr. Mays's defense counsel took the opportunity to confront Officer Lepsky with the discrepancies in his accounts of the incident. When specifically asked why his description of the incident in the taped statement did not include the physical touching, Officer Lepsky responded that the attorney conducting the interview "did not ask me if I put my hands on Mr. Mays."[16] Defense counsel pressed Officer Lepsky on the issue several more times, but after receiving the same answer abandoned the line of questioning. Ultimately, the district court found the discrepancies in Officer Lepsky's accounts "understandable given the quick succession of events."[17] The district court, having listened to this testimony and observed both the demeanor of the officer and the reenactment of the encounter, was on solid ground in accepting the testimony at the suppression hearing as true. The district court was also correct in determining that the officer's show of force by placing his hand on Mr. Mays's shoulder while asserting his authority constituted the seizure of Mr. Mays for purposes of the Fourth Amendment.

## B.

Having ascertained the point at which the Fourth Amendment was implicated, "we must now evaluate, under an objective standard, the totality for the circumstances known to

[16] R.62 at 33.

[17] R.61 at 3 n.4.

Officer [Lepsky] at that time and determine if a reasonable of-
ficer in those circumstances would have been suspicious."
*Ford*, 333 F.3d at 844 (internal quotation marks omitted). The
district court concluded that when Officer Lepsky physically
seized Mr. Mays, "reasonable suspicion existed to conclude
that Mr. Mays might have had a weapon and been about to
use physical force against Officer Lepsky."[18] We agree with
the court's conclusion.

First, although the Government concedes that Of-
ficer Lepsky did not have reasonable suspicion to believe that
Mr. Mays actually was involved in the fight, he knew that
Mr. Mays had left the scene upon the arrival of Officer Coff-
ing, a factor that we have held can be "suggestive of wrong-
doing and can be…considered in a court's determination of
…reasonable suspicion." *United States v. Carlisle*, 614 F.3d 750,
756 (7th Cir. 2010); *see Wardlow*, 528 U.S. at 124 (holding that
"unprovoked flight upon noticing the police" is pertinent to
the reasonable suspicion analysis); *Lawshea*, 461 F.3d at 860
(refusing to draw a constitutional distinction between run-
ning from the police and walking away evasively); *United
States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("In evalu-
ating the totality of the circumstances, we must also take into
account that Valentine and the two men with him immedi-
ately began walking away from the patrol car when it arrived.
Walking away from the police hardly amounts to the head-
long flight considered in *Wardlow* and of course would not
give rise to reasonable suspicion by itself, even in a high-crime
area, but it is a factor that can be considered in the totality of
the circumstances."). Officer Lepsky also knew that the fight

---

[18] *Id.* at 13.

had taken place in a high-crime area. Although this fact alone "cannot, in and of itself, support a particularized suspicion…an officer is permitted to consider a location's characteristics when assessing a situation." *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010).

Further, as Officer Lepsky testified at the suppression hearing, Mr. Mays's repeated refusal to stop, his agitated, profane responses, and his aggressive demeanor all provided additional cause for concern. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("A suspect's failure to halt upon police command to do so…support[s] a finding of reasonable suspicion."). Indeed, these factors, filtered through the officer's training and experience, caused Officer Lepsky to ask Mr. Mays to remove his hands from his pockets. *See Oglesby*, 597 F.3d at 894 ("Police officers are permitted to rely on their experience and training in forming a reasonable suspicion."). And Mr. Mays's response—to remove only his left hand but not his right, and to angle the right side of his body away as he continued walking—"made it reasonable for [Officer Lepsky] to infer that [Mr. Mays's] stance was potentially calculated to keep a weapon hidden or out of reach." *Id.* at 894–95.

Finally, when Officer Lepsky and Mr. Mays were only an arm's length apart, Mr. Mays, after repeatedly rebuffing the officer's requests to stop walking, abruptly stopped moving forward but "continued to move in a circular motion" as he turned his body around toward the officer.[19] It was at that

---

[19] R.62 at 20.

point that Officer Lepsky seized Mr. Mays by reaching out and grabbing his shoulder.

Based on the totality of the circumstances known to Officer Lepsky at that moment, it was reasonable for the officer to infer that Mr. Mays had a weapon in his right hand and was rounding to use physical force. It was reasonable to suspect that the man who was turning toward him in such a fashion was not merely having a change of heart and acquiescing in the officer's request for a consensual interview. Rather, the officer had an articulable reason to believe that the man before him was armed and a danger to his safety. The seizure was therefore permissible under the Fourth Amendment.

### C.

Because we find no Fourth Amendment violation, Mr. Mays's contention that his inculpatory statement was the fruit of an illegal seizure must fail. As for Mr. Mays's independent argument under the Sixth Amendment, he offers no evidence that his waiver of his right to counsel was not voluntary, knowing, and intelligent. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Absent such evidence, "when a defendant is read his *Miranda* rights…and agrees to waive those rights, that typically does the trick." *Id.*

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED