# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 01-1772, 01-1800, 01-1891, 01-1949 & 01-2065

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LARRY OLSON, also known as OREO;
ANDREW ACOSTA, also known as BK;
ANTONIO MENDEZ, also known as SPA;
PEDRO MARTINEZ, also known as PISTOL PETE;
and WILFREDO VASQUEZ, also known as PITO,
also known as PETE,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 98 CR 104—**Lynn Adelman,** *Judge.*

———————

ARGUED MAY 12, 2005—DECIDED MAY 12, 2006

———————

Before RIPPLE, ROVNER and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Five defendants appeal their various convictions for racketeering, racketeering conspiracy, conspiracy to distribute controlled substances, murder and drug trafficking. Four of the defendants were sentenced to life imprisonment and one received a prison term of 262 months. All of the charged conduct arises out of the defendants' participation in the Milwaukee Chapter of the street

gang known as the Almighty Latin King Nation ("Latin Kings"). All five defendants also appeal their sentences. We affirm the convictions of all five defendants, and order a limited remand of the sentences of four defendants. For the fifth defendant, we vacate the sentence and remand for resentencing.

## I.

The Latin Kings are a national criminal organization (often called the "Nation") based in Chicago, with chapters in many states. The chapters follow a written Constitution and Manifesto (collectively, the "Manifesto") that set forth the rules for membership and a code of conduct to which members must adhere. The Manifesto describes, among other things, the hierarchy that rules the national and local chapters of the organization, the colors and symbols that are to be worn and displayed by members, and certain hand gestures that indicate allegiance to the group. A five-pointed crown is the national emblem of the Latin Kings; black and gold are the official colors of the group. According to the Manifesto, a fist on the heart is the national salute, a gesture meaning, "I die for you." Another Latin Kings gesture known as "the crown" involves displaying the fingers of one hand in a configuration that resembles a crown. The Latin Kings have a national flag, several official prayers, and a set of trial procedures to be used when a member commits an offense. The Latin Kings code of honor denies membership to anyone who has killed a member of the group or killed a relative of a member. The Manifesto also ostensibly excludes as members rapists and men who are addicted to heroin.

On the national level, the Latin Kings are led by an executive committee known as the Crown. The Crown is headed by the Sun-King, a leader chosen by the Crown as a whole. The Crown has the authority to make laws for the

entire Latin Kings organization, which is further subdi-
vided into chapters. Each chapter is led by an Inca who has
the authority to make rules for his own chapter but not for
the Nation. So long as he abides by the Nation's laws, the
Inca has absolute authority over his chapter and also bears
responsibility for the actions of his chapter. Next in com-
mand at the chapter level is the Cacique (also called the
Casinca), whose duty is to make certain that the Inca's
orders are carried out. The Cacique takes on the Inca's role
if the Inca is imprisoned or dies, although the Inca retains
ultimate authority if his absence is due to imprisonment.
The Inca and Cacique are elected by the members of the
chapter. Each chapter also has an Enforcer, a Treasurer
and a Secretary, each appointed by the Inca and Cacique.
The Enforcer is in charge of "security" for every member of
the chapter and ensures that members obey the Nation
laws and the orders of the Inca and Cacique. Any member
who publicly discredits the Inca or Cacique may be charged
with conspiracy and treason. Latin Kings may not wear
anything that can be construed as being an emblem of
another organization. Members are admonished to protect
the lives and reputations of all other Nation members, not
to discuss Nation business with outsiders, and not to
submit to lie detector tests. The Nation is apparently wary
of the press but not entirely opposed to publicity; one rule
forbids giving press interviews on Nation business without
prior approval. According to the Manifesto, any member
who cooperates with the police will be expelled from the
group. In practice, that expulsion invariably is accompanied
by beatings (called "violations" in Latin Kings parlance) and
is sometimes accomplished by murder. The Manifesto also
mandates that "No King shall stand idle when another King
is in need of assistance." There are other rules and other
positions in the hierarchy; we have described only those
parts of the Manifesto necessary to understand the issues
in this case. In addition to the rules recorded in the Mani-
festo, a number of unwritten rules also came into play in

this case. We will address these as they become relevant to the issues.

The Milwaukee Chapter began operations in the mid-1980s and eventually grew large enough to control a large territory on Milwaukee's south side. The Milwaukee Chapter was, at times, divided into smaller geographically-based territories known as the Kagel Kings, the 23rd Street Kings, the Sawyer Kings and the 15th Street Kings. Within the Kagel Kings was a younger group known as the Junior Kings. The Milwaukee Chapter employed a city-wide Crown Council, with the chain of command continuing above the Inca. A regional Jefe and Corona reported directly to national leaders in Chicago. All of the defendants in this case were members of the Latin Kings in Milwaukee. Pedro Martinez ("Martinez") was the Inca of the Kagel Kings beginning in 1991 or 1992. Andrew Acosta ("Acosta") served as Cacique and Enforcer under Martinez and as Enforcer under a different Inca, Ray Rivera.[1] Wilfredo Vasquez ("Vasquez") led the Junior Kings. Antonio Mendez ("Mendez") was a member of the Latin Kings as a result of a merger between the Latin Kings and the Nasty Boys, the gang that Mendez joined initially. After his incarceration in 1993, Mendez became the Acting Chief Enforcer of a prison chapter of the Latin Kings. Olson was a member of the Junior Kings and later the Kagel Kings. He did not hold a particular rank.

The five defendants, together with twenty-six other Latin Kings, were charged in a Second Superseding Indictment with a variety of crimes. Count I alleged that Acosta, Martinez, Mendez, Vasquez and others conducted and participated in the conduct of the affairs of the Latin Kings through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). The indictment alleged sixty-seven

---

[1] Rivera pled guilty and testified against the defendants at trial.

underlying predicate offenses, including murders, robberies, kidnappings, arson, intimidation, drug trafficking and witness tampering. Many of the original thirty-one defendants resolved their cases before trial, reducing the number of predicate acts that remained in dispute at the time of trial. Moreover, the issues raised by these remaining five defendants implicate only a subset of the remaining acts presented at trial; to keep the facts manageable, we will detail only those predicate acts that play a part in the defendants' appeals. Acosta and Martinez were charged with Racketeering Act 8 ("Act 8"), which was divided into three subparts. Act 8(a) alleged conspiracy to murder Angelique Morales; Act 8(b) alleged the murder of Angelique Morales on January 23, 1994; and Act 8(c) alleged the attempted murder of Jennifer Burzynski on January 23, 1994. Racketeering Act 4 alleged that Mendez murdered Jenna Gonzales in May 1993. Count II alleged that all five defendants (and others) engaged in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count III alleged that Acosta, Martinez, Olson, Vasquez and others conspired to distribute and possess with intent to distribute controlled substances, including cocaine, cocaine base and marijuana, in violation of 21 U.S.C.§§ 841 and 846. Count IV charged Mendez with the murder of Jenna Gonzales for the purpose of maintaining his position with the Latin Kings, in violation of 18 U.S.C. § 1959. Count VIII charged Acosta with possession with intent to distribute a large quantity of marijuana, in violation of 21 U.S.C. § 841(a)(1). Count X charged Vasquez with marijuana distribution, in violation of 21 U.S.C. § 841(a)(1). The jury returned a guilty verdict on all counts. As for the racketeering acts alleged, the jury found that the government had proved the acts we have already listed (Acts 4 and 8) as well as a variety of crimes involving arson, conspiracies to murder, attempts to murder, drug possession and distribution, kidnappings, witness tampering, and solicitation of murder. The dates of these various criminal acts spanned approximately from

January 1987 through April 1999. The district court
sentenced Olson to 262 months' imprisonment; Acosta,
Mendez, Martinez and Vasquez all received sentences of life
in prison.

## II.

In their appeals, the defendants jointly raise two chal-
lenges to the sufficiency of the evidence and one challenge
to sentencing. First, for the racketeering counts, they
contend that the government failed to prove that the Latin
Kings were a single, ongoing enterprise during the time
period charged in the indictment. Second, they challenge
whether the evidence was sufficient to connect Racketeering
Act 8 with the enterprise. Finally, they maintain that their
sentences are unconstitutional under *Blakely v. Washing-
ton*, 542 U.S. 296, 124 S. Ct. 2531 (2004). Each defendant
claims additional error related to his individual case. Acosta
argues that his due process rights were violated when the
government mischaracterized the evidence relating to
racketeering Act 8 in closing arguments. Mendez contends
that the evidence was insufficient to connect the conduct
alleged in both Racketeering Act 4 and Count IV to the
enterprise. Vasquez asserts that the court erred when it
denied his motion to sever his trial from the others because
Thomas Overland, who pled guilty mid-trial, propounded a
defense that was antagonistic to Vasquez's defense.
Vasquez also faults the court for allowing Overland to
testify against Vasquez after Overland changed his plea to
guilty. Martinez maintains that the court erred in failing to
suppress statements he made during what he believed were
plea negotiations. He also complains that the court should
have suppressed any statements he made during an
interview in which prosecutors violated their ethical
obligations. Olson objects to his sentence, maintaining that
the court held him liable for a greater quantity of drugs
than was supported by the evidence. He also asserts his

sentence was cruel, unusual, excessive and failed to serve a valid purpose. We will begin with the issues that affect all of the defendants and then turn to the defendants' individual arguments.

## A.

Count I of the Second Superseding Indictment ("Indictment") charged the defendants with racketeering, in violation of 18 U.S.C. § 1962(c). The basic elements of a section 1962(c) violation are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005). Count II charged a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). To prove a RICO conspiracy, the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity. *United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir.), *cert. denied*, 479 U.S. 940 (1986). Thus, for each of these two counts, the government was required to prove the existence of the enterprise. The first joint argument for our review is the question of whether the government provided sufficient evidence of the enterprise alleged in the Indictment. According to the defendants, the enterprise alleged in the Indictment ceased to exist for a period of time in the mid-1990s and thus the government failed to prove a single, ongoing enterprise for RICO purposes.

When considering criminal defendants' challenges to the sufficiency of the evidence supporting their convictions, we review the evidence in the light most favorable to the government. *United States v. Bernitt*, 392 F.3d 873, 878 (7th Cir. 2004), *cert. denied*, 125 S. Ct. 1882 (2005); *United States v. Stott*, 245 F.3d 890, 904 (7th Cir.), *cert. denied*, 534 U.S. 1070 (2001). We will reverse a conviction only if no rational trier of fact could have found the crime's essential

elements beyond a reasonable doubt. *Bernitt*, 392 F.3d at 878; *Stott*, 245 F.3d at 904. *See also Cummings*, 395 F.3d at 397 (in reviewing a challenge to the sufficiency of the evidence, we consider the evidence in the light most favorable to the government, deferring to the jury's credibility determinations, overturning a verdict only when the record contains no evidence, however it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt). The statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The "central element of an enterprise is structure." *Neapolitan*, 791 F.2d at 500. We have held that in informal organizations such as criminal groups, there "must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much." *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir.), *cert. denied*, 519 U.S. 999 (1996) (quoting *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir.), *cert. denied*, 513 U.S. 993 (1994)). *See also United States v. Torres*, 191 F.3d 799, 806 (7th Cir. 1999), *cert. denied*, 528 U.S. 1180 (2000) (the continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the elements of enterprise); *Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 644 (7th Cir. 1995) (a RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making); *United States v. Tocco*, 200 F.3d 401, 425 (6th Cir. 2000) (continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than *ad hoc,* basis).

The Indictment defined the relevant enterprise as "the Almighty Latin Kings Nation, Milwaukee Chapter." R. 1321, ¶ 1. The Indictment alleged that the Milwaukee Chapter was established in the mid-1970s, that the enterprise had an organized structure set forth in the Manifesto, and that the Milwaukee Chapter was subdivided into geographical subchapters. According to the Indictment, the object and purposes of the Latin Kings enterprise were multi-faceted. Among other things, the Latin Kings sought to protect and defend their territory from rival street gangs; to enforce discipline among the group's own members; to traffic in controlled substances; to commit acts of robbery, home invasion and theft for the benefit of the Latin Kings; to obtain firearms for use in violent crimes and other Latin Kings endeavors; to provide economic and social support to the Nation; to preserve and protect the power of the enterprise, its associates and members through intimidation, threats of violence and acts of violence, including murder; to increase the membership of the enterprise; and to intimidate witnesses in an attempt to prevent them from cooperating with law enforcement authorities. The Indictment listed sixty-nine predicate acts that made up a pattern of racketeering activity. The acts spanned in time from 1987 through 2000.

The defendants concede that many of the government witnesses testified about the existence and structure of the Latin Kings but contend that the government provided insufficient evidence that the Latin Kings enterprise existed unabated throughout the time period alleged in the indictment. According to the defendants, some of the government's key witnesses testified that the Latin Kings ceased to operate as an ongoing organization in the mid-1990s and was revived some time later. In particular, Ray Rivera testified that he was asked to become Inca at a time of great disagreement and disorganization among the Latin Kings, causing the organization to split into two groups. Rivera opined that there was not "one overall organization" in late

1995 because of this in-fighting. David Keheres, a member of the Latin Kings, described a period of time when the Inca of the Kagel Kings, Herminio Vega, had been removed (or "violated out" in the parlance of the Kings) and was not replaced until Rivera came in a few months later to reorganize the group. Mark Turner, a Latin Kings Enforcer, testified that after Vega was expelled from the group, the Casinca tried unsuccessfully to take over but that there was "an empty void for a short period of time." This "empty void" was remedied when the members held a Nation meeting at which Rivera was elected Inca, Acosta was elected Casinca, and Turner was elected to be Enforcer. Turner testified to another period of disorganization after Martinez was ejected from the group. Benjamin Drews became a member of the Latin Kings in November 1995. His first Nation meeting was the one at which Rivera was elected Inca. Drews recalled that a man named Moe spoke at the meeting about the need for a new Inca in order to stop the "senseless shootings" that were occurring and in order to make everything run more smoothly. Miguel Romero, another Latin King, also testified that before Rivera was elected Inca, some Latin Kings were shooting at and fighting with other gangs at will. Rivera tried to stop the members from "running around wild, doing whatever they wanted to do." Thomas Overland testified that the Kings were in disorder prior to Rivera's election as Inca.

According to the defendants, other government witnesses had no knowledge of the Latin Kings in the mid-1990s and therefore could not support the government's theory that the Latin Kings were a continuous enterprise during the relevant time period. The defendants concede that two government witnesses, Alejandro Vallejo and Brian Turner, lent some support to the government's case. Vallejo testified that there was an "acting Inca" after Vega was ejected from the group and before Rivera was elected Inca. Brian Turner, a member and brother of Mark Turner, testified that Vega

was forced out at the same meeting that Rivera was elected to replace him. The defendants suggest that Vallejo was not a credible witness because of his extensive criminal history and that Brian Turner's portrayal of events was unsupported by any other witness to the Rivera election.

According to the defendants, this break in the leadership and supposed temporary split of the Latin Kings into two groups makes their case analogous to that of *United States v. Morales*, 185 F.3d 74 (2d Cir. 1999), *cert. denied*, 529 U.S. 1010 (2000). In that case, the government charged both a substantive RICO count as well as a RICO conspiracy count against several members of a street gang known as the "Park Avenue Boys." The indictment alleged that the enterprise existed from 1987 to 1996. At trial, the evidence showed that all of the Park Avenue Boys were dead or in prison by 1988. The group did not resume its operations until some members were released from prison in 1995. Thus there was a seven-year lull during which no crimes were committed. The government presented no evidence that the group continued to operate while its members were in prison. The court reversed the RICO convictions because the government failed to prove the existence of the single nine-year enterprise alleged in the indictment. 185 F.3d at 81.

The facts of *Morales* are palpably different from the situation of the Milwaukee Chapter of the Latin Kings in the mid-1990s. The most obvious difference is that the Latin Kings never faced a situation where the entirety of their membership was incapacitated by death or imprisonment for a multi-year part of the charged time period. At most, a certain subset of the Milwaukee Latin Kings lacked formal leadership for a few months of the thirteen-year period charged in the Indictment. Moreover, as the government points out, the Latin Kings were part of a national organization, with a structure set forth in the Manifesto. Consistent with the Manifesto, the Latin Kings held meetings, collected dues, elected officers, maintained a

treasury, studied the Manifesto, and enforced the code of conduct. New members were subjected to a review process and a probationary period before they were "violated into" the group, a process which involved taking a severe beating from current members. Members who failed to adhere to the code of conduct also received "violations," beatings that could result in hospitalization or death. The Latin Kings maintained guns and a pager that belonged to the group. They regularly reviewed police presence in their territory and took actions to keep rival gangs away from their turf.

In addition to that national structure, there was additional evidence from which the jury could infer that the Latin Kings existed as a single continuous enterprise in the Milwaukee area during the time period alleged in the indictment. First, as the defendants concede, two witnesses, Vallejo and Brian Turner, testified that there was no actual break in Latin King leadership in the mid-1990s. Although other witnesses testified to the contrary, the jury was free to believe these two and reject the contrary testimony. Indeed, the jury could have found that the break in leadership, if there was one, was very brief. Several Latin Kings testified that Vega was violated out of the group because he had cooperated with the police. Although there was some difference in testimony about the time frame for Vega's removal as Inca, at least one witness, Benjamin Drews, testified that Vega was removed from his position in December 1995. Drews also testified that Rivera was elected to be the new Inca in late December 1995 or early January 1996. Vallejo testified that Rivera was elected at a January 6, 1996 meeting and the jury was free to credit Vallejo's testimony.[2] In combination with Drews' testimony

---

[2] According to the Latin King Constitution, which was admitted into evidence along with the Manifesto, January 6 is considered a holiday in the organization. The Constitution states that in

(continued...)

that Vega was removed in December and replaced in late December or early January, the jury could infer that the group was without formal leadership for approximately one month. A very brief break in leadership does not compel a finding that the enterprise ceased to exist during that time.

The Manifesto anticipated gaps in leadership and provided that in the absence of the Inca, the Casinca or Cacique was in charge of the group. There was evidence that this plan was implemented after Vega's ouster. Vallejo testified that the Cacique was the "acting Inca" until a vote was held to elect a new Inca. Tr. at 3515. Although there was some testimony that the Cacique was unsuccessful in his attempts to lead the group and that members were engaging in independent criminal activity during this brief time, there is no legal requirement that an enterprise run like a well-oiled corporate machine. Some disorganization does not, as a matter of law, negate the existence of the enterprise. Indeed, the very witnesses on whom the defendants rely each supported the jury's determination that the Milwaukee Chapter of the Latin Kings was an enterprise for RICO purposes. For example, Rivera testified that the Latin Kings continued to exist from 1993 when he left the group through 1995 when he returned. Tr. at 562. Mark Turner confirmed that the Latin Kings continued to have an Inca from beginning to end, even during the period of disorganization when there were leadership changes. Tr. at

---

[2] (...continued)
recognition of Latino culture, January 6 will be known as "Holy Kings Day," a day of fasting and celebration. The Constitution states, "For on this day all Latin America will celebrate with us." Presumably, this is a reference to the January 6 holiday recognized in many Christian cultures as the Feast of the Epiphany or the Feast of the Three Kings, celebrating the visit of the three Magi who brought gifts to the infant Jesus twelve days after his birth.

1945-46. Keheres verified that the group had structure and organization even before Rivera took over. When asked if the Latin Kings had a "gang mentality" during the period of disorganization, Keheres replied, "No, not all of them." Tr. at 1311-18.

In addition to the alleged gap in leadership, of course, there was some testimony that the Latin Kings splintered into two groups, and again the defendants urge us to find that this is proof that the single enterprise alleged in the indictment did not exist continuously during the relevant time period. The enterprise alleged in the Indictment was the "Almighty Latin King Nation, Milwaukee Chapter." As we have discussed, the Milwaukee Chapter was broken down into regional groups, each with its own Inca and corresponding structure. Overseeing all of these groups or sects was a regional Jefe or Corona, a person who had authority over the Incas of the various Milwaukee sects and who reported to the national organization in Chicago. There was testimony, for example, that the Jefe was called in to resolve a dispute that arose when the Inca of one Milwaukee sect ordered the kidnappings of a member of another sect. There was also testimony that although there were a number of different neighborhood-based sects, they all were Latin Kings, representing the same crown and the same colors. Thus, the fact that the Kagel Kings may have splintered for a time was irrelevant to the continuing overall structure of the Milwaukee Chapter. There was abundant evidence from which the jury could infer that a single enterprise existed throughout the time period alleged in the indictment.

In *Torres*, we addressed a sufficiency of the evidence challenge to the enterprise element of a RICO charge. 191 F.3d at 807. The government had established at trial that the defendants functioned as an informal organizational unit of a larger organization to enforce the collection of drug

debts upon orders given to them by others in the larger organization. The informal group operated by kidnappings debtors or members of the debtors' families, and holding them for ransom to satisfy the drug debt. In addition to the testimony of some of the surviving kidnapping victims, physical evidence introduced at trial included firearms, cell phones, pagers, and ammunition found in a van used by the group and at two hide-outs. We commented that this physical evidence demonstrated that the defendants were a well-equipped, sophisticated group engaged in criminal activities and provided support for the jury's finding of the existence of an enterprise. *Torres*, 191 F.3d at 807. *See also Tocco*, 200 F.3d at 425 (recognizing that the command system and general structure of the organized crime group La Casa Nostra is evidence of the existence of an enterprise separate from the type of structure inherent in a pattern of racketeering activity); *United States v. Flynn*, 852 F.2d 1045, 1052 (8th Cir.), *cert. denied*, 488 U.S. 974 (1988) (finding that the command system of a Mafia family is an example of the type of structure that is distinct from the pattern of racketeering activity). The Latin Kings operated in similar fashion, as a well-equipped organization with a defined hierarchical command structure, a Manifesto and Constitution that guided their behavior, and allegiance to a national organization. The central element of an enterprise is structure and the Latin Kings maintained its structure throughout the period described in the Indictment. *Neapolitan*, 791 F.2d at 500. A rational trier of fact easily could have found the existence of the defined enterprise beyond a reasonable doubt. *Bernitt*, 392 F.3d at 878. The jury was well within its province to ignore any temporary gaps in leadership or splintering of subgroups in finding that a single criminal enterprise existed during the time period alleged in the Indictment. We therefore see no reason to disturb the jury's verdict on the RICO counts.

**B.**

The defendants' second joint argument relates to the three-part Racketeering Act 8. Act 8(a) alleged a conspiracy to murder Angelique Morales; Act 8(b) charged the murder of Angelique Morales on January 23, 1994; and Act 8(c) alleged the attempted murder of Jennifer Burzynski on January 23, 1994. According to the defendants, the government provided insufficient evidence to connect Racketeering Act 8 to the enterprise. As we noted earlier, in a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the government, and we will reverse a conviction only if no rational trier of fact could have found the crime's essential elements beyond a reasonable doubt. *Bernitt*, 392 F.3d at 878; *Stott*, 245 F.3d at 904. The defendants contend that the government did not prove one of the elements of section 1962(c):

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The Supreme Court held that "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original). *See also United States v. Swan*, 250 F.3d 495, 498 (7th Cir. 2001) (to be liable under section 1962(c), an individual must have participated in the operation or management of the enterprise itself). The defendants reason that if a charged racketeering act was not committed in order to operate or manage the enterprise, that act cannot support a RICO charge. They posit that the murder of Morales and the

attempted murder of Burzynski were unrelated to the Latin Kings enterprise. Rather, they contend, the evidence demonstrated that Acosta was enraged with his girlfriend on the night in question, that Martinez tried to calm him down and talk him out of killing Morales, and that Martinez, the Inca, did not order the murder. The defendants concede that their convictions for racketeering will still stand because the jury found that they committed other predicate acts that they do not challenge here. The murder of Morales and attempted murder of Burzynski, however, dramatically lengthened their sentences and they therefore challenge the jury's finding on Racketeering Act 8 for that reason. We turn to the facts surrounding Racketeering Act 8, reviewing them in a light most favorable to the government.

In Milwaukee, gangs are generally separated into two factions known as "People" and "Folks." The Latin Kings are allied with the People faction and consider themselves to be at war with Folks-aligned gangs. Angelique Morales was associated with the Maniac Latin Disciples ("MLD"), a Folks-aligned gang. In 1993, she attended a Cypress Hill concert with members of the MLDs.[3] During the concert, Morales, who had a backstage pass, went up on the stage and "threw the crown down," that is, she displayed the Latin Kings' crown hand gesture in an upside-down fashion. She also convinced a member of the Hooligan band, another group playing that night, to make the same gesture, telling him it was the symbol for "I love you." The Latin Kings consider an upside-down display of the crown to be disre-

---

[3] Cypress Hill is a Los Angeles-based rap group. Their website describes their music as "Latino hip-hop/rock fusion." Their skull-covered album covers and song titles reveal a juvenile fascination with death, violent street life and drug use, especially marijuana. Many of their songs can be purchased in "clean" or "explicit" forms. *See* www.sonymusic.com/artists/CypressHill.

spectful. Acosta was also at the concert and when he saw Morales make this gesture, he "came up and got in her face and started charging her up, started getting obnoxious to her and started yelling at her." Tr. at 2443. Acosta called Morales a "Flake Bitch," a derogatory term for a Folks-aligned person. Tr. at 2444-45. Another person present at the concert testified that Acosta screamed at Morales, calling her a "Folk Bitch." According to the witness, Acosta said to Morales, "We're going to kill you, we're going to get you, and you ain't shit, bitch." Tr. at 2471. The altercation ended with Morales and her friends exiting the stage while concert security personnel intervened with Acosta. Morales was well known to the Latin Kings before this event. She had previously been seen in Latin Kings neighborhoods, throwing the crown down and pointing out the homes of Latin Kings members to MLDs. The Latin Kings also believed Morales had served as a driver when MLDs fired shots at the homes of Latin Kings. Because of her reputation for disrespecting the Latin Kings, a "lot of dudes hated her." Tr. at 1682. Her disrespect for the Latin Kings was discussed at meetings.

On January 23, 1994, Acosta and others attended a birthday party for Martinez's son. At the party, Acosta argued with his girlfriend, creating a disturbance loud enough to attract the attention of police officers. The girlfriend left the party and later in the evening, Acosta left the party with Martinez, Eric Estrada and Emiliano Vargas, Martinez's young cousin. At the time, Martinez was the group's Inca, Estrada was the Casinca, and Acosta was the Enforcer. Martinez drove and Acosta rode in the front passenger seat with the other two passengers in back. The group passed a gas station and pulled over. Angelique Morales and a friend, Jennifer Burzynski, had stopped at that same gas station to use a pay phone. Acosta spotted Morales and exited Martinez's car. As Acosta left the car, Martinez told him to "leave it alone." Tr. at 2211. Acosta

approached the car where Morales and Burzynski were sitting and waiting for a person they had paged. According to Burzynski, when Morales saw Acosta, she became terrified and exclaimed, "Oh shit, there's the King that charged me up at the Cypress Hill concert." Tr. at 2109. Morales, in a panic, turned the ignition of the car even though it was already on. She tried to put the car in drive but could not move the shifter because her foot was not on the brake. As Burzynski tried to direct her to put the car in gear by putting her foot on the brake, Acosta looked inside the car, pulled a gun from his pants and pointed it at Morales. After clearing a jam in the gun, Acosta fired six shots into the car, hitting both Morales and Burzynski. At the first shot, Burzynski opened her door, threw herself from the car and played dead. After Acosta left, Burzynski got up from the ground and saw that Morales was hunched over the steering wheel, gasping for air. A moment later, Morales stopped gasping. Terrified that Acosta would return and see her still alive, Burzynski fled the scene and called 911 from the home of her boyfriend's cousin. She survived her injuries and testified against Acosta in state court (where he was acquitted) and later in the instant case.

Meanwhile, back in Martinez's car, after Acosta exited the car, Estrada asked Martinez to leave. Martinez refused, saying he did not want to leave Acosta there alone. After a few minutes, Estrada heard gunshots and a few moments after that Acosta came running back to the car. He got in and Martinez drove Estrada home. The next day, Estrada read about the shooting in the newspaper and Acosta was subsequently arrested for the crime. Martinez and Estrada hired an attorney for Acosta. Martinez paid $20,000 for the lawyer, using proceeds from drug sales. According to Estrada, Martinez had reason to "look out" for Acosta because Acosta handled all of Martinez's "operations," doing all the "dirty work" for Martinez. Tr. at 2214. Martinez's "operations" involved drug sales, among other things.

Estrada did not approach the police with any of this information because the Latin Kings code of conduct prohibited members from cooperating with police officers or any other law enforcement agency. Tr. at 2217. Martinez ordered another Latin King to dispose of the gun, a nine millimeter pistol that was a Nation gun. Acosta and Martinez later bragged to their fellow Latin Kings that they "smoked that bitch" and that Morales deserved what happened to her. Martinez told David Lozano, a Latin King and cooperating witness, that when they saw Angelique Morales at a telephone booth, "[t]hey decided to take advantage of the opportunity and get Angelique," who had previously disrespected the Latin Kings. Tr. at 6583.

An argument that this evidence was insufficient to tie Racketeering Act 8 to the Latin Kings enterprise borders on the frivolous. The jury heard testimony from numerous cooperating Latin Kings members that when someone "disrespected" the Latin Kings, members were obliged to respond with violence ranging from beatings to shootings. If they failed to respond to signs of disrespect with whatever violent means they had available at the time, they faced punishment ranging from fines to beatings at the next Latin Kings meeting. Morales disrespected the Latin Kings in a very public way when she threw the crown down on stage at a Cypress Hill concert and when she drove MLDs into Latin Kings neighborhoods to point out and shoot at houses. Indeed, Acosta told Morales at the concert that he would kill her. The Latin Kings discussed their hatred of Morales at a meeting. Indeed, Morales' last words, in dramatic fashion, tied what was about to happen to the incident at the Cypress Hill concert. She knew this was the Latin King who had "charged [her] up" at the concert after her purportedly disrespectful hand gesture. That Martinez may have told Acosta to "leave it alone," is of little moment; his actions in staying at the scene and providing Acosta with transportation spoke louder than his words. The

Manifesto required that Martinez not "stand idle when another King is in need of assistance," and he did not stand idle. He provided Acosta a means of escape from the scene of the crime, disposal of the gun, and legal assistance. There was some evidence presented that the gun used was a Nation gun, which meant that only the Inca could authorize its use. The jury was entitled to infer that Martinez, who was then the Inca, authorized the shooting. The jury was also free to infer that Acosta shot Burzynski in an attempt to eliminate any witnesses to the murder of Angelique Morales, thus tying her attempted murder to the conduct of the enterprise. The defendants' argument amounts to a claim that Acosta was in a rage over the fight with his girlfriend and that he was indulging his personal rage rather than conducting Latin Kings business when he murdered Morales. The jury rejected that theory and instead concluded that the murder of Angelique Morales was sufficiently connected to the affairs of the enterprise. The use of Racketeering Act 8 at sentencing was thus entirely appropriate. We will address the remaining sentencing issues, including those raised jointly, after we address the remaining challenges to the convictions.

## C.

Antonio Mendez challenges his conviction for the murder of Jenna Gonzales. Racketeering Act 4 charged Mendez with the 1993 murder of Jenna Gonzales. The Indictment also charged this murder as a substantive violation of 18 U.S.C. § 1959(a)(1), which prohibits a violent crime in aid of racketeering activity. According to the Indictment, Mendez committed this murder in order to gain entrance to, maintain and increase his position in the Latin Kings enterprise. Section 1959 provides, in relevant part:

> Whoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise

> engaged in racketeering activity, murders . . . any individual in violation of the laws of any State or the United States, or attempts or conspires to do so, shall be punished—
>
> (1) for murder, by death or life imprisonment, or a fine under this title, or both[.]

18 U.S.C. § 1959(a). According to Mendez, the government provided insufficient evidence that the murder of Jenna Gonzales was ordered by the Latin Kings or was related to Latin Kings business, or that Mendez committed the murder for the purpose of gaining entrance into or maintaining or increasing his position in the Latin Kings.

As was the case for most of the trial, there was conflicting evidence on the murder of Jenna Gonzales. Mendez took the stand to admit that he was present when Gonzales was murdered but to deny that he took part in the killing and to deny that it was related to the Latin Kings. But as with any sufficiency challenge where the jury has rendered a guilty verdict, we construe the facts in the light most favorable to the government. The government's evidence was more than sufficiently damning. The story began with the murder of Craig Abendroth, described alternately as a Latin King "wannabe" or a Latin King recruit. The government provided evidence that Abendroth, a friend of Mendez, was murdered by the Spanish Cobras, a rival gang. Mendez believed that Jenna Gonzales had set up Abendroth to be killed by the Cobras and Mendez wanted revenge. After the murder, Mendez described the killing to his girlfriend, Koni Watson, and Watson testified to that admission at trial. According to Watson, Mendez had been driving around with other Latin Kings when they came across Gonzales, the woman Mendez believed had set up Abendroth. They picked her up and drove her out to the Root River Parkway where they choked her and beat her with sticks. They then kicked her down into the river and waited for her to die in the water. Their car was stuck in the mud near the river so they abandoned the car and walked to a pay phone where

they called cabs. When Mendez got home, he took a shower and washed his body down with peroxide to remove any hair or lint. He also washed his clothing, including his tennis shoes. The police found the car, which belonged to Mendez's mother, the next day. They contacted Mendez's mother using information found in the glove compartment. Mendez returned to the scene with his mother to retrieve the car with the help of a police tow. More than a week later, a man walking in the park with his children found Gonzales's body floating in the river less than a quarter of a mile from where Mendez's car had been found. An autopsy revealed lacerations to her head, a broken nose, a fractured jaw, cracked skull and other signs of blunt force trauma.

Before the body was found, Mendez and Watson, who had a stormy relationship, had an argument. According to Watson, the argument related to Mendez's fear that Watson was going to snitch on him. Mendez briefly choked Watson and said, "Do I have to kill you too?" Tr. at 735. Mendez later told Watson which Latin Kings participated in the murder with him, identifying Anthony Davis, Pedro Martinez and Joel Castillo. When Watson expressed disbelief at this story, Mendez told her to watch the news; Watson eventually saw the murder reported on the news.

Other witnesses confirmed Watson's story. While in prison for an unrelated rape, Mendez shared a cell with David Lozano, the Inca of that prison's chapter of the Latin Kings. Mendez bragged to Lozano that he killed Gonzales because she had set up Abendroth to be killed by the Spanish Cobras. Mendez told Lozano that Abendroth was his friend and a Latin King recruit. When he learned that Gonzales was involved in Abendroth's murder, he decided to take revenge on her. Mendez told Lozano that he and other Latin Kings beat Gonzales to death and threw her in the Root River. Two other witnesses, Robin Betz and Joel Castillo, also testified that Mendez admitted his involvement in Gonzales's murder. Mendez stipulated at trial that he has a "Kingmaster" tattoo on his back, a bearded king

wearing a five-point crown. Mendez's Kingmaster tattoo included a teardrop under the left eye. Other witnesses testified that a teardrop tattoo in this location would indicate that a person has murdered someone for the Latin Kings.

There was additional evidence but this is enough. Mendez admitted to at least two people that he killed Gonzales and that the murder was revenge for her involvement in the death of a Latin King recruit. As we discussed with the murder of Angelique Morales, Latin Kings were obliged by their code of conduct to take violent action whenever someone disrespected the Latin Kings. A reasonable jury could find that this is exactly what Mendez did. The evidence is thus sufficient to prove that the murder was related to the conduct of the Latin Kings enterprise, and that Mendez committed the murder in order to maintain his position in the Latin Kings.

## D.

Acosta raises an individual challenge to his RICO convictions, arguing that the government violated his due process right to a fair trial during closing arguments. According to Acosta, the government mischaracterized the testimony related to Racketeering Act 8, the murder of Angelique Morales, the attempted murder of Jennifer Burzynski and the conspiracy to commit those acts. Acosta characterizes the government's case on Act 8 as weak, noting that there was no evidence of a directive given to Latin Kings to harm Morales. Instead, Acosta argues, the evidence showed that Pedro Martinez, the Inca, tried to dissuade Acosta from committing the murder, and that Acosta had a domestic dispute earlier that evening with his girlfriend, who was at the gas station just prior to the murder. He also claims the evidence showed that, although Morales was associated with a rival gang, she also had friends among the Latin Kings. All of this, Acosta reasons, demonstrates that the

murder was unrelated to the Latin Kings enterprise. Acosta posits that because of these purported weak spots in the government's case, the prosecutor, in closing arguments, mischaracterized the evidence in a number of instances: (1) the government told the jury that Vargas and Estrada, who were in the car at the time of the murder, testified that Martinez planned the murder and worked together "hand in glove" to see it through; (2) the government misstated Estrada's testimony by saying that even though he heard Martinez tell Acosta to "leave it alone" on the night of Morales' murder, Martinez did not really mean it; (3) the prosecutor implied that Acosta murdered Morales as part of the "dirty work" he performed for Martinez; and (4) the prosecutor suggested that the murder was related to the Latin Kings enterprise because the Kings told Andrea Martinez to lie for Acosta at his state trial for the Morales murder. Acosta maintains that each of these statements individually and in the aggregate grossly mischaracterized the evidence and deprived him of his due process right to a fair trial.

In reviewing a due process challenge to a prosecutor's statements during closing argument, we first determine if the comments were, when viewed in isolation, improper. *United States v. Anderson*, 303 F.3d 847, 854 (7th Cir. 2002), *cert. denied*, 538 U.S. 938 (2003); *United States v. Scott*, 267 F.3d 729, 740 (7th Cir. 2001), *cert. denied*, 535 U.S. 1099 (2002). If they were improper, we consider the record as a whole to determine whether the comments deprived the defendant of a fair trial. *Anderson*, 303 F.3d at 854; *Scott*, 267 F.3d at 740. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *See also United States v. Morgan*, 113 F.3d 85, 89 (7th Cir. 1997). When we review the record as a whole, we consider (1) the nature and seriousness of the misconduct;

(2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instructions to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction. *Scott*, 267 F.3d at 740; *Morgan*, 113 F.3d at 90. Acosta failed to object to at least two of the statements to which he now objects, and our review of those statements is limited to plain error. *Scott*, 267 F.3d at 740. Under the plain error standard, Acosta must establish not only that the remark denied him a fair trial but also that the outcome of the proceedings would have been different absent the remark. *Scott*, 267 F.3d at 740.

The first comment to which Acosta objects relates to the testimony of Vargas and Estrada, two of the people in the car with Acosta on the night of the Morales murder. The prosecutor argued:

> They [Vargas and Estrada] came in here and told you that they were the two other people in the car. Emiliano Varga [sic], a young cousin of Pedro Martinez. So happy to be in the car with a bunch of Kings. How exciting. Pulled up to 16th and Forest Home. Andrew Acosta knew exactly what to do. He jumps out of the car, goes between some houses. Hears gunshots. Comes back, Angelique Morales is dead. They worked together like a hand in glove.

Tr. at 7531. Acosta maintains that neither witness testified that Martinez and Acosta worked together to have Morales killed. He also contends that Vargas testified he did not hear gunshots and knew nothing about the shooting. As for Estrada, Acosta emphasizes that Estrada heard Martinez tell Acosta to "Leave it alone," indicating they did not work together to kill Morales.

Although neither witness testified directly that Martinez and Acosta worked together to murder Morales, that was a

fair inference to argue from the evidence as a whole. As we discussed above, Martinez had authority as Inca to direct the actions of Acosta, his Enforcer. Martinez aided Acosta by providing transportation to and from the scene of the crime, and by helping Acosta dispose of the murder weapon. Martinez also paid for Acosta's lawyer after he was arrested and charged with the murder. All of these actions were consistent with the Latin Kings Manifesto and were consistent with the prosecutor's argument that the two worked together "hand in glove." Although Vargas testified that he did not hear gunshots over the sound of the radio that was blaring in the car, Estrada did testify to hearing gunshots after Acosta exited the vehicle. Because the remarks were not improper when viewed in isolation, there is no need to analyze them further.

We turn to the next purportedly objectionable comment:

Eric Estrada told us that although he heard Pedro Martinez say "Leave it alone," he didn't mean it. Because he stayed. Eric Estrada told us that if he was driving, he would have left.

Tr. at 7533. Acosta is correct that Estrada did not directly state that Martinez did not mean it when he told Acosta to "leave it alone." Viewing this statement in isolation, it was not a correct characterization of Estrada's testimony. Acosta did not object to this statement at trial and we thus review it for plain error. In the context of the paragraphs preceding and following this remark, it is clear that the prosecutor did not mean to quote Estrada but was asking the jury to infer from his testimony that Martinez said one thing but meant another in light of his actions. That was a fair inference to draw from the evidence and we cannot see how the outcome of the trial would have changed if the prosecutor had made clear that he was not quoting Estrada but interpreting him. We find no error here.

Acosta next complains that the prosecutor improperly argued that murder was part of the "dirty work" that Acosta performed for Martinez. According to Acosta, when Estrada testified that Acosta performed Martinez's "dirty work," Estrada meant receiving drug shipments, distributing them and collecting drug debts. Because Estrada did not mention murder when asked what he meant by "dirty work," Acosta argues that this was an improper argument. Here is what the prosecutor said:

> Eric Estrada told us that he had seen a nine millimeter Beretta at Pedro Martinez's house before the shooting, and he also told us that Pedro Martinez never went anywhere without a gun. He also told us that Andrew Acosta was the person who did his dirty work. Damn right.

Tr. at 7530. Acosta's attorney objected "to that last comment and move[d] that it be stricken." Tr. at 7530. It is unclear from the record whether he objected to the phrase "dirty work" or to the exclamation "Damn right." He certainly did not explain that he objected because the statement mischaracterized the testimony. Whether we review the statement for plain error or under the less stringent standard, we cannot find that it was an improper statement. Estrada in fact testified that Acosta "handled all of the operation for Pistol," and that he "did all the dirty work mainly." Tr. at 2215.[4] Although Estrada used drug distribution and debt collection as examples of dirty work, he did not confine the term to those activities. Other evidence demonstrated that it was a common Latin Kings practice for an Inca to distance himself from criminal activity, letting others with lesser stature in the organization take the risks associated with criminal acts. Because

---

[4] "Pistol" or "Pistol Pete" were both known nicknames for Pedro Martinez.

the comment was not improper, we need not consider it further.

That brings us to the final statements to which Acosta objects. According to Acosta, the government suggested in its closing argument that the Morales murder was connected to the Latin Kings because Acosta required witnesses lie for him in his state court trial for the murder. The specific remarks to which Acosta objects follow:

> The Latin Kings tried to make people lie in court. Tried to have people come in and make sure justice isn't done. Andrea Martinez lied to that jury in order to protect the Kings.

Tr. at 7536.

> Hide the truth, have witnesses lie, do what is necessary to have done. Much like Mr. Acosta when he had Andrea Martinez, who got up here and told you lied [sic] about what she had done.

Tr. at 8025. Acosta did not object to the first statement at trial, and it is literally true. Andrea Martinez did admit in her testimony in the instant case that she lied at Acosta's state court trial to protect Acosta and her brother, Pedro Martinez. Acosta objected to the second statement, arguing that there was "no testimony from Andrea Martinez that Mr. Acosta told her to lie. For Mr. Robles to state that is a gross distortion of the record." Tr. at 8025. The court noted the objection and instructed the jury that "the question of what the evidence was is a matter for the jury's recollection." Tr. at 8025-26. To the extent that the prosecutor suggested that Andrea Martinez testified that Acosta asked her to lie at the state court trial, Acosta is correct that she made no such admission. She testified instead that she lied in the state court trial because she loved her brother, Pedro Martinez and she liked Acosta, and the Latin Kings did not ask her to do anything. Tr. at 2319-20.

This was, at worst, a small distortion of the record that was remedied by the court's immediate instruction to the jury that their own recollection of the testimony should prevail over the attorneys' characterizations. There was plenty of testimony that the Latin Kings had a policy of not cooperating with law enforcement and that they dealt harshly with anyone who did cooperate. More than one member was "violated out" of the group for suspicion of cooperation with law enforcement, and it is a fair inference that testimony at trial that implicated the Latin Kings in a murder would be considered cooperation with law enforcement. Andrea Martinez was subpoenaed by Acosta to testify at his state court trial. Andrea's truthful testimony would not have helped Acosta, a fact that she acknowledged and that he surely knew as well. As the sister of the Inca, the jury could infer she knew the consequences of testifying at trial in a manner that implicated Acosta in the murder. The jury could conclude that, although Acosta did not ask her directly to lie for him, Andrea interpreted that subpoena as a request for untruthful testimony. In considering the five factors we outlined above, we conclude that this slight mischaracterization of Andrea Martinez's testimony did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. Nor did any combination of these supposed misstatements deprive Acosta of a fair trial.

### E.

Wilfredo Vasquez objects to the district court's refusal to sever his trial from that of Thomas Overland because Overland's defense was antagonistic to his defense. He also contends that the court erred in allowing Overland to testify against him after Overland changed his plea to guilty in the middle of the trial. Vasquez's defense centered on whether the government could prove that any of the alleged predi-

cate acts were committed by an enterprise as that term is defined by the RICO statute. The crux of this defense, explains Vasquez, was to demonstrate that the Latin Kings were not sufficiently organized to sustain the RICO charges. Instead, he claimed that they were a loose collection of rogues who largely did what they wanted to do when they wanted to do it. Overland, on the other hand, claimed a defense of coercion by the Latin Kings organization. In support of this defense, Overland essentially conceded that the Latin Kings were an enterprise and argued that he was coerced into committing illegal acts by that enterprise. Key to Overland's defense, according to Vasquez, was that Overland could not escape the coercion of the Latin Kings because of the group's chain of command, its laws, and its system of retribution. Vasquez contends that Overland needed to show the existence of the Latin Kings enterprise in order to prove his defense. Vasquez thus argues that the district court abused its discretion when it refused to sever his trial from Overland's trial. Vasquez also claims an abuse of discretion in the district court's decision to allow Overland to testify for the prosecution after he reached a plea agreement mid-way through the trial. According to Vasquez, Overland was present at the trial for weeks before pleading guilty, allowing him to tailor his testimony to conform to the government's theory of the case.

We review the denial of a motion to sever for abuse of discretion. *United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003), *cert. denied*, 540 U.S. 1201 (2004); *United States v. Rollins*, 301 F.3d 511, 517-18 (7th Cir. 2002); *United States v. Ramirez*, 45 F.3d 1096, 1100 (7th Cir. 1995). In order to prevail in this appeal, Vasquez must demonstrate that the denial of severance caused him actual prejudice that deprived him of his right to a fair trial. *Souffront*, 338 F.3d at 831; *Rollins*, 301 F.3d at 518. We have held that it is insufficient that separate trials would have given the defendant a better opportunity for an acquittal. *Souffront*, 338 F.3d at 831; *Rollins*, 301 F.3d at

518. In this case, Vasquez bases his claim on what he characterizes as the antagonistic defense of Thomas Overland. The district court declined to sever Vasquez's trial on this basis because whether or not there was an enterprise was not dispositive of Overland's defense. Overland claimed he was coerced by Mark Turner, by other Latin Kings and by his fear of the Latin Kings generally. The court reasoned that such a defense was not inconsistent with Vasquez's theory that there was no RICO enterprise because Overland could be coerced even if the Latin Kings did not meet the legal standard for a RICO enterprise.

Although there was some tension between Vasquez's defense and Overland's theory of the case, the district court did not abuse its discretion in denying the severance. When defendants are properly joined under Federal Rule of Criminal Procedure 8(b), a district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Ramirez*, 45 F.3d at 1100. The occurrence of mutually antagonistic defenses is generally not sufficient grounds to require severance. *Souffront*, 338 F.3d at 831. Mutually antagonistic defenses are not prejudicial *per se. Souffront*, 338 F.3d at 831. Vasquez has failed to show that he suffered actual prejudice because of Overland's defense. Vasquez has not shown that any of the harmful evidence that came in through the efforts of Overland's counsel would have been inadmissible if Vasquez had been tried separately, for example. The evidence against Vasquez was rather extensive and would have been overwhelming even if he had been tried separately. Evidence about the Latin Kings organization and structure was also very strong as we discussed above. Severance was not required to protect any specific trial right in this instance; nor did a joint trial of Vasquez and Overland prevent the jury from making a reliable judgment

about Vasquez's guilt or innocence. The district court did not abuse its discretion in denying the severance.

Nor did the court abuse its discretion in allowing Overland to testify against Vasquez after Overland pled guilty mid-trial. Before Overland testified, the court carefully instructed the jury on the limited use of Overland's testimony:

> The next witness is Thomas Overland, who you will recall was a former defendant in this case. Mr. Overland pleaded guilty to Count I of the indictment, and is now going to be testifying on behalf of the United States.
>
> I want to instruct you that you are not to draw any negative inference against the remaining defendants whatsoever based upon Mr. Overland's decision to enter a guilty plea and to testify during the trial. I want to further instruct you that the guilt of any person, including Mr. Overland, is not evidence of the guilt of any other person, specifically the remaining defendants.
>
> And finally, I want to instruct you that you can give Mr. Overland's testimony such weight you feel it deserves, keeping in mind that it must be considered with caution and great care. And I will have much more instructions about the whole case later on, but I wanted to instruct you of that point right now before Mr. Overland testifies.

Tr. at 6098-99. At the end of the trial, the court instructed the jury again on the special caution they must use in assessing testimony from witnesses who stated they were involved in the commission of offenses or acts charged against the defendants and from witnesses who had pleaded guilty to offenses arising out of the same occurrences for which the defendants were on trial. R. 1889, at 9-10. The court admonished the jury not to use those witnesses' guilty pleas as evidence against the defendants. R. 1889, at 10.

The testimony of a co-defendant who negotiates a mid-trial plea bargain is admissible in certain circumstances for limited purposes. *United States v. Thomas*, 774 F.2d 807, 809 (7th Cir. 1985), *cert. denied*, 475 U.S. 1024 (1986). In *Thomas*, a co-defendant pleaded guilty nine days into a sixteen-day trial and then testified against the remaining defendants. On appeal, those remaining defendants complained that the testimony of their former co-defendant (1) was improper because he had participated in pre-trial defense planning and thus was aware of privileged conversations and strategies; (2) violated Federal Rule of Evidence 615, the witness exclusion rule, because he had been present for the entire trial and could mold his testimony to fit the government's case; and (3) required reversal because the prejudicial impact upon the jury of a defendant-turned-government-witness could not be overstated. We held that, because such testimony was admissible for limited purposes, the lower court's cautionary instructions were key to determining whether reversible error occurred. Because the court in that case gave appropriate cautionary instructions and the defendants raised no objections to those instructions, we found there was no reason for reversal. *Thomas*, 774 F.2d at 809-10. The same analysis applies here. The court gave appropriate cautionary instructions and Vasquez has not objected to those instructions. We find no abuse of discretion.

## F.

Pedro Martinez complains that the district court erred when it failed to suppress a statement he made during a meeting which he reasonably believed was a plea negotiation. He also contends that the court should have suppressed his statements because they were obtained in violation of the prosecutor's ethical obligations. A magistrate judge conducted evidentiary hearings on Martinez's

motion to suppress and issued a report and recommendation. The district court then reviewed those parts of the report and recommendation to which objections were filed. We recount the facts as the district court found them.

In April 1998, Martinez was serving a 157-month sentence in federal prison in Indiana for a conviction on an unrelated offense. On April 27, 1998, he was brought to the Eastern District of Wisconsin to appear in a line-up. FBI Special Agent Daniel Craft decided to interview Martinez on matters related to the instant case, and brought him to the U.S. Attorney's office in Wisconsin on April 28, 1998. However, Assistant U.S. Attorney Chris Larsen determined that Martinez could not be interviewed until Larsen determined whether Martinez was represented by a lawyer. For a one-hour period that day, Agent Craft stayed in a conference room with Martinez, and Larsen went into the room two or three times during that period. According to Martinez, Agent Craft used this opportunity to tell Martinez about Sammy "The Bull" Gravano, a well-known underboss of the Gambino crime family. Agent Craft described Gravano to Martinez as a mobster who confessed to nineteen homicides but served only five years in prison because he cooperated with the government in its case against John Gotti. Martinez believed that Agent Craft raised the Gravano case in order to obtain Martinez's cooperation. Agent Craft denied talking to Martinez about Gravano on April 28 but acknowledged that he discussed Gravano with other Latin Kings, telling them that Gravano cooperated and then received leniency. According to Martinez, Agent Craft also told him that Agent Craft might be able to get him a ten- year deal, and that Assistant U.S. Attorney Karine Moreno-Taxman trusted Agent Craft and would likely listen to any recommendation he made.

Between April 28 and April 30, Larsen determined that Martinez's lawyers represented him only in the appeal of his conviction in the Northern District of Indiana and not

on potential charges in the Eastern District of Wisconsin. Prosecutors then called for an April 30 meeting with Martinez at the U.S. Attorney's office. According to Larsen, the purpose of the meeting was to explore Martinez's potential cooperation. Agent Craft testified that prosecutors were present in the hope that Martinez might offer to confess and incriminate others in exchange for a deal that only prosecutors could offer.

The April 30 meeting lasted only ten or fifteen minutes. Agent Craft brought Martinez to the U.S. Attorney's office where they were joined by Larsen and Moreno-Taxman. Martinez testified that on the drive over from the jail, Agent Craft told him several times, "Don't worry about the numbers, you'll be satisfied with the outcome." When Martinez stated he would not cooperate if it meant a double-digit sentence, Agent Craft replied that they might be able to have his sentence run concurrently with the sentence he was then serving. Once at the meeting, according to Martinez, when he asked Agent Craft why they were meeting, Agent Craft replied, "if you cooperate, we can make this disappear." Because Larsen corroborated Agent Craft's denial regarding this statement, the court found that Agent Craft made no such statement. Instead, the court found that Moreno-Taxman asked Agent Craft to read Martinez his *Miranda* rights. When Agent Craft began to inform Martinez about his rights, Martinez interrupted him, saying that he knew his rights better than Agent Craft. Martinez then recited several of his *Miranda* rights from memory. Agent Craft then read Martinez his *Miranda* rights in full and asked him if he wanted to speak without an attorney present. Martinez agreed to do so. Moreno-Taxman then told Martinez that she had evidence linking him to at least three homicides and gave Martinez an account of the murder of Angelique Morales. This prompted Martinez to correct parts of her account that he believed were mistaken, thereby implicating himself in the murder.

At some point in the discussion, Martinez asked if he could speak off the record and Moreno-Taxman told him emphatically that everything was on the record. Martinez then asked for some time to think about it, and the meeting ended. Larsen testified that no promises or threats were made during the meeting, nor was there any plea bargaining or discussion of plea bargaining. In fact, Larsen attested, prosecutors had not even discussed the possibility of a plea bargain among themselves before the meeting.

The district court noted that Agent Craft's credibility had been seriously undermined by his conduct in an unrelated case in another state. The court therefore chose not to credit Agent Craft's testimony except where it was consistent with the testimony of a credible witness such as Larsen. The court found that, even assuming that Agent Craft discussed the Gravano case with Martinez on April 28, Martinez did not have an objective reason to believe he was participating in plea negotiations on April 30. The court remarked that "[c]omments that things might go better for a suspect if he or she cooperates do not convert a suspect's subsequent efforts to cooperate, even if in hope of gaining leniency by a plea, into plea bargaining discussions." *United States v. Acosta*, 111 F.Supp.2d 1082, 1091 (N.D. Ill. 2000). The court noted that Agent Craft's statement about getting Martinez a ten-year deal demonstrated to Martinez that Agent Craft did not himself have the authority to engage in plea bargaining because he indicated he would simply make a recommendation to Moreno-Taxman. The court found that nothing else occurred at the meeting that would give rise to a reasonable belief that the meeting was a plea bargain discussion. The court discounted the statements that Agent Craft allegedly made to Martinez because he was not a government attorney and it was clear to Martinez that, at most, Agent Craft could make a recommendation to Moreno-Taxman.

On appeal, Martinez argues that he exhibited a subjective belief that he was engaging in plea discussions at the April 30 meeting and that this belief was reasonable. Statements made in the course of plea discussions with a prosecutor generally are inadmissible under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. When reviewing a district court's decision on a motion to suppress, we review questions of law *de novo* and questions of fact for clear error. *United States v. Brown*, 232 F.3d 589, 591 (7th Cir. 2000). We review *de novo* the district court's ultimate conclusion of whether the statements were made in the course of plea negotiations because the determination is a mixed question of law and fact. *Brown*, 232 F.3d at 591-92. *See also United States v. Morgan*, 91 F.3d 1193, 1195 (8th Cir. 1996), *cert. denied*, 519 U.S. 1118 (1997) (district court's ultimate determination that a statement was given in the course of plea negotiations is a mixed question of law and fact reviewed *de novo*). Martinez argues that he spoke at the meeting only because Moreno-Taxman assured him everything was off the record, because Agent Craft told him on April 28 that he could get him a ten-year deal, and because Moreno-Taxman discussed his connection to several homicides. Once Moreno-Taxman told him everything was on the record, he asked for time to think it over and the meeting ended. Finally, Agent Craft's remarks to him on April 28 and in the car on April 30 led him to believe that a plea bargain might be discussed at the meeting. All of this, he claims, demonstrated a subjective belief that he was engaged in a plea discussion.

The district court found that Moreno-Taxman never told Martinez that his remarks would be off the record. Martinez offers no reason to disturb this finding of fact and we see no reason to do so. There is nothing about Moreno-Taxman's statements connecting Martinez to several homicides that would lead him to believe he was engaged in a plea discussion rather than an interrogation. The fact

that Martinez asked for time to think things over after Moreno-Taxman emphatically told him everything was on the record tells us nothing about whether he thought he was engaged in plea negotiations. That leaves Agent Craft's statements. Because the district court found Agent Craft was generally not a credible witness, we too will assume that Agent Craft made the statements that Martinez claims he made. Federal Rule of Evidence 410 specifies that "any statement made in the course of plea discussions *with an attorney for the prosecuting authority* which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" is generally not admissible against the defendant who was a participant in the plea discussions. Fed. R. Evid. 410 (emphasis added). *See also United States v. Brumley*, 217 F.3d 905, 910 (7th Cir. 2000) (finding that the exclusion of statements made during plea discussions applies only to statements made to government attorneys and not to statements made to law enforcement agents); *United States v. Lewis*, 117 F.3d 980, 984 (7th Cir.), *cert. denied*, 522 U.S. 1035 (1997) (same). Agent Craft was not an attorney for a prosecuting authority and did not purport to be speaking on behalf of the United States Attorney. To the contrary, Agent Craft made clear that he could, at most, recommend a plea agreement to Moreno-Taxman and that she trusted him. He made the general kinds of statements that law enforcement agents commonly make, that cooperation will likely lead to a better outcome for the defendant. *See Brumley*, 217 F.3d at 910. Martinez himself, when he interrupted Agent Craft to recite his *Miranda* rights, stated that he knew that anything he said could be used against him. In short, nothing either the prosecutors or Agent Craft did or said to Martinez led him to reasonably believe that the April 30 meeting was a plea discussion. The court was correct to deny the motion to suppress on that basis.

Martinez also challenged the use of his April 30 statements because, he argued, they were obtained in contraven-

tion of the prosecutors' ethical obligations. Assistant United States Attorneys practicing in Wisconsin are subject to the dictates of Wisconsin Supreme Court Rule 3.8(b). That Rule provides that the prosecutor in a criminal case must undertake "reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel." Wis. Sup. Ct. R. 20:3.8(b).[5] Martinez contends that, although prosecutors told Martinez he had the right to an attorney, they did not inform him about the procedure for obtaining one or give him a reasonable opportunity to obtain counsel. He argues that suppression of his statements is the appropriate remedy for this alleged ethical violation.

The district court rejected the government's argument that Rule 3.8(b) does not apply until a suspect is formally indicted. The court found that the prosecutors advised Martinez of his right to an attorney but failed to advise him of the procedure for obtaining counsel and did not give him an opportunity to do so, both contrary to Rule 3.8(b)'s requirements. The court declined, however, to suppress the evidence obtained during the April 30 meeting. Acknowledging the dearth of authority interpreting any rules governing prosecutors, the court found that any violation was not egregious, highly improper or unconscionable. The court therefore declined to exercise its supervisory powers to suppress the evidence.

---

[5] Rule 2.05 (now found in slightly modified form at General Local Rule 83.10(a)) of the Local Rules for the Eastern District of Wisconsin required government attorneys, including prosecutors, to adhere to the Wisconsin Supreme Court's Rules of Professional Conduct for Attorneys, SCR 20:1.1-8.5. Additionally, a federal statute requires government attorneys to comply with the ethical rules of the state in which they practice. *See* 28 U.S.C. § 530B(a).

We are doubtful that the prosecutors here violated any ethical rules. They carefully investigated whether Martinez was represented by counsel and insisted on a complete reading of his *Miranda* rights even after he interrupted the recitation to boast that he knew his rights better than Agent Craft. He told the prosecutors that he was smart enough to decide what to do on his own. He then agreed to speak without a lawyer after being told he had a right to an attorney and that one would be appointed for him if he could not afford to hire a lawyer himself. Neither the district court nor the parties nor this court could find any authority requiring anything more specific of the prosecutors than what they did here, and Rule 3.8(b) itself is somewhat ambiguous about its application in the setting of a pre-indictment, custodial interrogation. But we need not decide conclusively whether the district court was correct in finding an ethical violation because the court did not abuse its discretion in declining to suppress the statements. *United States v. Johnson*, 327 F.3d 554, 562 (7th Cir. 2003), *cert. denied*, 540 U.S. 1111 (2004) (reviewing for abuse of discretion a court's exercise of its inherent powers). Even if this was an ethical lapse, and again, we are not deciding that issue today, we see no reason to require suppression. Nothing in the record indicates that this was a wilful or egregious act on the part of these prosecutors; to the contrary, they appeared to be making every effort to comply with their prosecutorial obligations. Nor did their conduct result in a constitutional violation. And finally, there was no clear authority informing them that they were under an obligation to do more than they did. For these reasons, we find no abuse of discretion in the district court's decision not to suppress the evidence obtained at the April 30 meeting.

## III.

We turn now to the defendants' sentencing claims. The defendants' joint opening brief was filed after the Supreme

Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), but before the Supreme Court decided *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). The district court sentenced all of the defendants in 2001, using the mandatory Guidelines scheme that existed pre-*Booker*. The joint brief thus sought to have all of the sentences vacated and remanded for new sentencing hearings. In his individual brief, Olson also challenged the court's Guidelines calculations and argued that his sentence violated his Eighth Amendment right to be free from cruel and unusual punishment. By the time the government filed its responsive brief, the Supreme Court had decided *Booker* and we had issued our opinion in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 1343 (2006), where we set forth a procedure for limited remand in certain cases where a *Booker* objection had not been properly preserved. The government noted that four of the defendants, Martinez, Mendez, Olson and Vasquez, had not preserved a *Booker* claim and asked that we issue a limited *Paladino* remand in those cases. The government conceded that Acosta preserved a *Booker* claim but argued that any error was harmless. The government nonetheless suggested that we should order a *Paladino* remand of Acosta's case to ensure that any error did not prejudice Acosta. In their reply briefs, three of the defendants, Martinez, Mendez and Vasquez, request *Paladino* remands. Because the government concedes that *Paladino* remands are appropriate for those three defendants, we order limited remands in their cases in accordance with our procedure in *Paladino*, so that the court may consider whether it would have imposed a different sentence had it known that the Guidelines were advisory rather than mandatory.

Acosta preserved his *Booker*-type claim and asks that we vacate his sentence and remand for resentencing. The government argues that any error in sentencing Acosta was harmless and that he should at most receive a *Paladino*

remand. In *United States v. Schlifer*, 403 F.3d 849 (7th Cir. 2005), we noted that the remedial part of *Booker*, which requires the courts to consult the Guidelines in an advisory fashion, must be applied to all cases pending on direct review, even in the absence of a Sixth Amendment violation. 403 F.3d at 853. "Thus, in every pending appeal where the district court sentenced a defendant under the now-defunct mandatory guidelines scheme, error will have been committed." 403 F.3d at 853. The existence of error, however, does not automatically lead to resentencing in every case. Rather, we will apply the doctrines of plain error and harmless error in determining whether resentencing is necessary. 403 F.3d at 853. Although the other four defendants are subject to the plain error standard because they forfeited this objection in the district court, Acosta preserved his objection and is entitled to plenary review. 403 F.3d at 853-54. Because the district court's error amounts to a misapplication of the Guidelines, Acosta's sentence must be vacated unless the error was harmless. 403 F.3d at 854. "When an error relates to the validity of a defendant's sentence, it is harmless only if it did not affect the district court's choice of sentence." 403 F.3d at 854. The government argues that the error was harmless here because Acosta executed Angelique Morales, carried out a brutal premeditated attack on a deputy at a local jail while awaiting trial in this case, and because Acosta occupied positions of leadership in the Latin Kings where he was a large-scale drug trafficker. Moreover, Acosta told the probation officer drafting his pre-sentence report that he will always be a Latin King and he expressed no remorse for his crimes. The government has not demonstrated that the court's misapplication of the Guidelines as mandatory did not affect its choice of sentence. We have reviewed the transcript of Acosta's sentencing hearing, which occurred at a time when no one anticipated the changes brought about by *Booker*. The district court made no definitive comments that we

could use to determine that the error was harmless. Therefore, we must vacate Acosta's sentence and remand for resentencing. *Schlifer*, 403 F.3d at 853-54.

Olson did not preserve a *Booker* objection but he argues that the district court miscalculated his Guidelines range. Both the government and Olson agree that he is entitled to a *Paladino* remand but we must first address the merits of his arguments about errors in the court's Guidelines calculations. *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005); *United States v. Skoczen*, 405 F.3d 537, 549 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 1380 (2006). The Guidelines "retain force even though they are no longer mandatory, and thus errors in their application remain relevant. *Skoczen*, 405 F.3d at 549. The Guidelines are now treated as advisory and if the district court erred in its Guidelines calculations, its judgment about a reasonable sentence would presumably be affected by that error. *Dean*, 414 F.3d at 727 (*Booker* requires the sentencing judge first to compute the Guidelines sentence and then to decide whether the Guidelines sentence is the correct sentence to give that particular defendant); *Skoczen*, 405 F.3d at 549. We continue to review the district court's factual findings at sentencing for clear error and we review the application of the Guidelines to those facts *de novo*. *United States v. Arnaout*, 431 F.3d 994, 998 (7th Cir. 2005).

The jury found Olson guilty of one count of conspiracy to commit racketeering and one count of conspiracy to distribute controlled substances. The verdict form for the latter count asked the jurors to specify which controlled substances Olson conspired to distribute and they indicated "cocaine in any form" and marijuana. Olson now argues that the district court erred when it found that (1) he could have reasonably foreseen the distribution of more than 30,000 kilograms of marijuana-equivalent; and (2) he possessed firearms at the time he committed his crimes. He also contends that his sentence of 262 months violates the Eighth Amendment prohibition against cruel and unusual

punishment. In finding that Olson reasonably foresaw the sale of more than 30,000 kilograms of marijuana equivalent, the district court accepted a summary of the trial evidence prepared by the government and included in the pre-sentence investigation report ("PSR"). The court declined to apply a two-point enhancement for a leader/organizer in a drug conspiracy and instead found that Olson was a minor participant, warranting a two-level decrease. The court accepted the PSR recommendation to add two levels to Olson's drug conspiracy sentence pursuant to § 2D1.1(b)(1) because Olson stored Nation guns.

We begin with the gun enhancement. Olson complains that the court adopted the PSR recommendation without making any findings on the issue. The government characterizes this argument as frivolous, noting that Olson never objected to this enhancement when given an opportunity to do so in the district court. The government urges us to limit our review of this issue to plain error. Under any standard, Olson's objection fails. Olson conceded at his sentencing hearing that he stored 160 pounds of marijuana at his home; we will address the other quantities below but for the sake of the gun enhancement, we will take Olson at his word that he stored this enormous amount of marijuana in his home. This is not, needless to say, a personal use quantity, although Olson apparently helped himself to whatever amounts he wanted for personal consumption. Olson also conceded that he participated in shootings and ample testimony supported Olson's participation in violent Latin Kings "missions" that involved shootings. At least two witnesses testified that Nation guns were stored at Olson's house. To support an enhancement under § 2D1.1(b), the government bears the burden of proving by a preponderance of the evidence that a gun was possessed during the commission of the offense or relevant conduct. *United States v. Berthiaume*, 233 F.3d 1000, 1003-04 (7th Cir. 2000). *See also United States v. Hernandez*, 330 F.3d 964, 991 (7th Cir.

2003), *cert. denied*, 541 U.S. 904 (2004) (a defendant may be held responsible for a co-defendant's possession of a weapon if that possession was in furtherance of jointly undertaken criminal activity and was reasonably foreseeable by the defendant). If the government satisfies this standard, the burden shifts to the defendant to show that it was clearly improbable that the gun was connected to the offense. *Berthiaume*, 233 F.3d at 1004. The government met its burden with evidence that Nation guns were stored at Olson's house, that Olson stored and sold drugs out of the house and that Olson participated in Nation shootings where Nation guns were used. Olson has presented no evidence to demonstrate that the guns were not connected to the offenses at issue. The court thus did not err in adding two levels to Olson's offense level for possession of a gun under § 2D1.1(b).

We next consider whether the court erred in finding Olson liable for more than 30,000 kilograms of marijuana equivalent. Olson attacks the credibility of a number of witnesses who testified at trial and also challenges several erroneous statements that appear in the PSR. The government concedes several errors in the PSR but argues that they are harmless. For example, the PSR states that Miguel Romero testified that Vasquez's drug houses sold one to two ounces of crack each week. In fact, the PSR should have stated that Romero would testify to that figure if asked and had given that number in a pretrial statement. The PSR also stated that Douglas Beyreis saw Olson sell crack when in fact Beyreis testified that he saw Olson sell only marijuana. The PSR also slightly misstated the testimony of Thomas Overland. Overland had testified to providing Vasquez with cocaine outside of another house on the same block as Olson's house but the PSR placed the transfer outside of Olson's house. Finally, the PSR mischaracterized the pre-trial statements of Benjamin Drews as testimony. Drews, like Romero, provided information to authorities before trial that he was not asked to repeat under oath at the trial.

The district court's calculation of the quantity of drugs involved in the offense is a finding of fact reviewed for clear error. *United States v. Hamzat*, 217 F.3d 494, 499 (7th Cir. 2000). As the government points out, other witnesses provided testimony that supported the court's findings about the amount of drug sales reasonably foreseeable to Olson, and in the instances where the PSR mischaracterized proffers as testimony, the district court would have been entitled to use the proffers in calculating drug quantities. Indeed, the district court presided over the trial and knew which statements were made under oath at trial and which were made in pre-trial proffers, even if the PSR mischaracterized those statements. Among the evidence at trial that demonstrated the extent of Olson's involvement with crack sales, Brian Turner's testimony alone established an amount of crack that would justify Olson's sentence. Turner testified that Olson ran a crack house for Vasquez, selling approximately one ounce per week from the winter of 1995 until March of 1997. That means that for approximately sixteen months or sixty-eight weeks, Olson sold an ounce of crack each week. Sixty-eight ounces translates to approximately 1927.8 grams of crack. Under the 2000 Sentencing Guidelines, one gram of crack is treated as equivalent to 20 kilograms of marijuana, which would mean Olson sold the equivalent of 38,556 kilograms of marijuana. Jordan Mueller also testified that Olson and Vasquez sold crack out of Olson's house, and Mueller delivered one to two ounces of crack to Olson's house five to ten times. And of course, Olson was liable not only for the amounts he personally sold but also for the foreseeable amounts sold by his co-conspirators, including Vasquez. *United States v. Jarrett*, 133 F.3d 519, 531 (7th Cir.), *cert. denied*, 523 U.S. 1112 (1998). The determination of reasonable foreseeability is a factual determination reviewed for clear error. *Jarrett*, 133 F.3d at 531. Olson attempts to attack the credibility of Turner who he describes as "not just unreliable" but "incredible." The sentencing judge is

best situated to determine the credibility of the witnesses, however, and we will not disturb the court's finding on credibility unless it is without foundation. *United States v. Ferguson*, 35 F.3d 327, 333 (7th Cir. 1994), *cert. denied*, 514 U.S. 1100 (1995). Olson claims that the sentencing judge may have mistakenly believed that Turner's testimony was corroborated by Romero, Beyreis, Overland and Drews. Again, however, the sentencing judge presided over the trial and heard the testimony; he was thus able to distinguish between statements made under oath at trial and statements proffered in the pre-trial process. We cannot find clear error in the drug quantity calculation.

Olson also argues that his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment because his sentence is grossly disproportionate to the crime committed. He contends he was a small-scale dealer and that he was only a minor participant in the Latin Kings conspiracy. He notes that after he was sentenced, Congress amended the Guidelines in November 2002 to cap the base offense level for drug offenders who receive mitigating role reductions (as he did here) in conspiracy to distribute offenses. If the amendment were taken into account, he argues, his sentence would have been capped at 135 months, or roughly half of the sentence he ultimately received. The government points out that the cap on which Olson relies was rescinded in November 2004 and that the Guidelines now apply a sliding scale tied to the defendant's drug quantity when the defendant receives a minor role adjustment. Under that scenario, the government posits, Olson's 262-month sentence would still be within the range of the current Guidelines. The government also points out that Olson was not merely a drug dealer but stored guns for the Latin Kings, gave violations, and was present when shootings were ordered and completed. Based on this additional conduct, Olson was exposed to a forty-year sentence, twenty years on Count II and twenty years

on Count III. Olson disagrees with the government's calculations, contending that, under the November 2004 amendment, he would be subject to, at most, a 210-month sentence.

The Eighth Amendment prohibits punishments which involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004). In non-capital felony convictions, a particular offense that falls within legislatively prescribed limits will not be considered disproportionate unless the sentencing court abused its discretion. *Henry v. Page*, 223 F.3d 477, 482 (7th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001). The primary reason for the length of Olson's sentence is his sale of crack cocaine and the foreseeable sales of crack by his co-conspirators. His sentence was within the properly calculated range prescribed by the Sentencing Guidelines at the time of sentencing and the district court did not abuse its discretion in sentencing Olson within those limits. The Supreme Court has upheld against an Eighth Amendment challenge a sentence of life without the possibility of parole for possession of 672 grams of cocaine. *Harmelin v. Michigan*, 501 U.S. 957, 994-95 (1991). We thus find no constitutional violation here. Even though we find no error in the district court's Guidelines calculations, Olson is entitled to a limited remand pursuant to our procedures in *Paladino*, so that the court may consider whether it would have imposed a different sentence had it known that the Guidelines were advisory rather than mandatory.

## IV.

In sum, we affirm the convictions of all five defendants. We order limited remands in the cases of Martinez, Mendez,

Vasquez and Olson for proceedings consistent with *Paladino* and this opinion. We vacate Acosta's sentence and remand for resentencing consistent with this opinion. Pending the outcome of the limited remands, this court will retain jurisdiction over the appeals.

A true Copy:

     Teste:

                             _____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*